1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   PHILIP F. ATKINS-PATTENSON, Cal. Bar. No. 94901
2  TED C. LINDQUIST, III, Cal. Bar No. 178523
   Four Embarcadero Center, Seventeenth Floor
3  San Francisco, California  94111
   Telephone:    (415) 434-9100
4  Facsimile:    (415) 434-3947
   E-mail:    patkinspattenson@sheppardmullin.com
5          tlindquist@sheppardmullin.com

6  Attorneys for Defendant
   ALASKA AIRLINES, INC.

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                 (SAN FRANCISCO DIVISION)

11

12  KENNETH DON NELSON,                    Case No. C 08-03560 EDL
    suing individually and on behalf of
13  all others similarly situated,         **CLASS ACTION**

14               Plaintiff,               **1)    DEFENDANT
                                                  ALASKA AIRLINES, INC.'S
15      v.                                        NOTICE OF MOTION AND
                                                  MOTION TO DISMISS
16  ALASKA AIRLINES, INC., and                    [FED. R. 12(b) (6)];**
    defendant Does 1 through 100,
17  inclusive.                            **(2)   MEMORANDUM OF POINTS
                                                  AND AUTHORITIES IN
18               Defendants.                       SUPPORT THEREOF; and**

19                                        **(3)   DECLARATIONS OF
                                                  KEVIN THIEL, STEVE JARVIS,
20                                                JEFF BUTLER, AND PHILIP F.
                                                  ATKINS-PATTENSON IN
21                                                SUPPORT THEREOF.**

22                                         Date:       September 9, 2008
                                           Time:       9:00 a.m.
23                                         Courtroom:  E (15th Floor)

24

25

26

27

28

# EXHIBIT "A"

# Convention for the Unification of Certain Rules for International Carriage by Air

## Montreal, 28 May 1999

copy @ www.lexmercatoria.org *

* Generated by SiSU  www.jus.uio.no/sisu
www.sisudoc.org

Generated by SiSU [insert url of document] www.jus.uio.no/sisu
Copyright © 1997, current 2007 Ralph Amissah, All Rights Reserved.
SiSU is software for document structuring, publishing and search (with object citation numbering), www.sisudoc.org
SiSU is released under GPL 3 or later, <http://www.fsf.org/licenses/gpl.html>.

Document information:
*sourcefile* air.carriage.unification.convention.montreal.1999.sst
Generated by SiSU www.jus.uio.no/sisu
version information:   SiSU 0.61.0 of 2007w41/5

For alternative output formats of this document check:
<http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/sisu_manifest.html>

sisu

# Contents

**Convention for the Unification of Certain Rules for International Carriage by Air (Montreal, 28 May 1999)** . . . . . . . . . . . 1

**Chapter 1 - General Provisions** . . . . . . . . . . . . . . . . 1
Article 1 - Scope of application . . . . . . . . . . . . . . . . 1
Article 2 - Carriage performed by State and carriage of postal items . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Chapter II - Documentation and Duties of the Parties Relating to the Carriage of Passengers, Baggage and Cargo** . . . . 2
Article 3 - Passengers and baggage . . . . . . . . . . . . . . . 2
Article 4 - Cargo . . . . . . . . . . . . . . . . . . . . . . . . 2
Article 5 - Contents of air waybill or cargo receipt . . . . . . 3
Article 6 - Document relating to the nature of the cargo . . . . 3
Article 7 - Description of air waybill . . . . . . . . . . . . . 3
Article 8 - Documentation for multiple packages . . . . . . . . 3
Article 9 - Non-compliance with documentary requirements . . . . 3
Article 10 - Responsibility for particulars of documentation . . 3
Article 11 - Evidentiary value of documentation . . . . . . . . 3
Article 12 - Right of disposition of cargo . . . . . . . . . . . 4
Article 13 - Delivery of the cargo . . . . . . . . . . . . . . . 4
Article 14 - Enforcement of the rights of consignor and consignee 4
Article 15 - Relations of consignor and consignee or mutual relations of third parties . . . . . . . . . . . . . . . . . . . 4
Article 16 - Formalities of customs, police or other public authorities . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Chapter III - Liability of the Carrier and Extent of Compensation for Damage** . . . . . . . . . . . . . . . . . . . 5
Article 17 - Death and injury of passengers - damage to baggage 5
Article 18 - Damage to cargo . . . . . . . . . . . . . . . . . . 5
Article 19 - Delay . . . . . . . . . . . . . . . . . . . . . . . 6
Article 20 - Exoneration . . . . . . . . . . . . . . . . . . . . 6
Article 21 - Compensation in case of death or injury of passengers 6
Article 22 - Limits of liability in relation to delay, baggage and cargo . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Article 23 - Conversion of monetary units . . . . . . . . . . . 7
Article 24 - Review of limits . . . . . . . . . . . . . . . . . 8
Article 25 - Stipulation on limits . . . . . . . . . . . . . . . 8
Article 26 - Invalidity of contractual provisions . . . . . . . 8
Article 27 - Freedom to contract . . . . . . . . . . . . . . . . 8
Article 28 - Advance payments . . . . . . . . . . . . . . . . . 9
Article 29 - Basis of claims . . . . . . . . . . . . . . . . . . 9
Article 30 - Servants, agents - aggregation of claims . . . . . 9
Article 31 - Timely notice of complaints . . . . . . . . . . . . 9
Article 32 - Death of person liable . . . . . . . . . . . . . . 9
Article 33 - Jurisdiction . . . . . . . . . . . . . . . . . . . 10
Article 34 - Arbitration . . . . . . . . . . . . . . . . . . . . 10
Article 35 - Limitation of actions . . . . . . . . . . . . . . . 10
Article 36 - Successive carriage . . . . . . . . . . . . . . . . 10
Article 37 - Right of recourse against third parties . . . . . . 11

**Chapter IV - Combined Carriage** . . . . . . . . . . . . . . . 11
Article 38 - Combined carriage . . . . . . . . . . . . . . . . . 11

**Chapter V - Carriage by Air Performed by a Person other than the Contracting Carrier** . . . . . . . . . . . . . . . . . 11
Article 39 - Contracting carrier - actual carrier . . . . . . . 11
Article 40 - Respective liability of contracting and actual carriers 11
Article 41 - Mutual liability . . . . . . . . . . . . . . . . . 11
Article 42 - Addressee of complaints and instructions . . . . . 12
Article 43 - Servants and agents . . . . . . . . . . . . . . . . 12
Article 44 - Aggregation of damages . . . . . . . . . . . . . . 12
Article 45 - Addressee of claims . . . . . . . . . . . . . . . . 12

iii

## Contents

Article 46 - Additional jurisdiction . . . . . . . . . . . . . . . . . . 12
Article 47 - Invalidity of contractual provisions . . . . . . . . . . 12
Article 48 - Mutual relations of contracting and actual carriers . . . 13

**Chapter VI - Other Provisions** . . . . . . . . . . . . . . . . . . **13**
Article 49 - Mandatory application . . . . . . . . . . . . . . . . . . 13
Article 50 - Insurance . . . . . . . . . . . . . . . . . . . . . . . . 13
Article 51 - Carriage performed in extraordinary circumstances . . . 13
Article 52 - Definition of days . . . . . . . . . . . . . . . . . . . 13

**Chapter VII - Final Clauses** . . . . . . . . . . . . . . . . . . . **13**
Article 53 - Signature, ratification and entry into force . . . . . . 13
Article 54 - Denunciation . . . . . . . . . . . . . . . . . . . . . . 14
Article 55 - Relationship with other Warsaw Convention instru-
            ments . . . . . . . . . . . . . . . . . . . . . . . . . 14
Article 56 - States with more than one system of law . . . . . . . . 15
Article 57 - Reservations . . . . . . . . . . . . . . . . . . . . . . 15

**Document Information (metadata)** . . . . . . . . . . . . . . . . . **16**
Metadata . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Information on this document copy and an unofficial List of**
**Some web related information and sources** . . . . . . . . . . . . **16**
Information on this document copy . . . . . . . . . . . . . . . . . . 16
Links that may be of interest . . . . . . . . . . . . . . . . . . . . 17

# CONVENTION FOR THE UNIFICATION OF CERTAIN RULES FOR INTERNATIONAL CARRIAGE BY AIR (MONTREAL, 28 MAY 1999)

THE STATES PARTIES TO THIS CONVENTION

RECOGNIZING the significant contribution of the Convention for the Unification of Certain Rules relating to International Carriage by Air signed in Warsaw on 12 October 1929, hereinafter referred to as the "Warsaw Convention", and other related instruments to the harmonization of private international air law;

RECOGNIZING the need to modernize and consolidate the Warsaw Convention and related instruments;

RECOGNIZING the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution;

REAFFIRMING the desirability of an orderly development of international air transport operations and the smooth flow of passengers, baggage and cargo in accordance with the principles and objectives of the Convention on International Civil Aviation, done at Chicago on 7 December 1944;

CONVINCED that collective State action for further harmonization and codification of certain rules governing international carriage by air through a new Convention is the most adequate means of achieving an equitable balance of interests;

HAVE AGREED AS FOLLOWS:

## CHAPTER 1 - GENERAL PROVISIONS

### Article 1 - Scope of application

1. This Convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward. It applies equally to gratuitous carriage by aircraft performed by an air transport undertaking.

2. For the purposes of this Convention, the expression "international carriage" means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transhipment, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party. Carriage between two points within the territory of a single State Party without an agreed stopping place within the territory of another State is not international carriage for the purposes of this Convention.

3. Carriage to be performed by several successive carriers is deemed, for the purposes of this Convention, to be one undivided carriage if it has been regarded by the parties as a single operation, whether it had been agreed upon under the form of a single contract or of a series of contracts, and it does not lose its international character merely because one contract or a series of contracts is to be performed entirely within the territory of the same State.

4. This Convention applies also to carriage as set out in Chapter V, subject to the terms contained therein.

### Article 2 - Carriage performed by State and carriage of postal Items

1. This Convention applies to carriage performed by the State or by legally

Convention for the Unification of Certain Rules for International Carriage by Air

constituted public bodies provided it falls within the conditions laid down in Article 1.

2. In the carriage of postal items, the carrier shall be liable only to the relevant postal administration in accordance with the rules applicable to the relationship between the carriers and the postal administrations.

3. Except as provided in paragraph 2 of this Article, the provisions of this Convention shall not apply to the carriage of postal items.

## CHAPTER II - DOCUMENTATION AND DUTIES OF THE PARTIES RELATING TO THE CARRIAGE OF PASSENGERS, BAGGAGE AND CARGO

### Article 3 - Passengers and baggage

1. In respect of carriage of passengers, an individual or collective document of carriage shall be delivered containing:

(a) an indication of the places of departure and destination;

(b) if the places of departure and destination are within the territory of a single State Party, one or more agreed stopping places being within the territory of another State, an indication of at least one such stopping place.

2. Any other means which preserves the information indicated in paragraph 1 may be substituted for the delivery of the document referred to in that paragraph. If any such other means is used, the carrier shall offer to deliver to the passenger a written statement of the information so preserved.

3. The carrier shall deliver to the passenger a baggage identification tag for each piece of checked baggage.

4. The passenger shall be given written notice to the effect that where this

Convention is applicable it governs and may limit the liability of carriers in respect of death or injury and for destruction or loss of, or damage to, baggage, and for delay.

5. Non-compliance with the provisions of the foregoing paragraphs shall not affect the existence or the validity of the contract of carriage, which shall, nonetheless, be subject to the rules of this Convention including those relating to limitation of liability.

### Article 4 - Cargo

1. In respect of the carriage of cargo, an air waybill shall be delivered.

2. Any other means which preserves a record of the carriage to be performed may be substituted for the delivery of an air waybill. If such other means are used, the carrier shall, if so requested by the consignor, deliver to the consignor a cargo receipt permitting identification of the consignment and access to the information contained in the record preserved by such other means.

### Article 5 - Contents of air waybill or cargo receipt

The air waybill or the cargo receipt shall include:

(a) an indication of the places of departure and destination;

(b) if the places of departure and destination are within the territory of a single State Party, one or more agreed stopping places being within the territory of another State, an indication of at least one such stopping place; and

(c) an indication of the weight of the consignment.

2

Convention for the Unification of Certain Rules for International Carriage by Air

### Article 6 - Document relating to the nature of the cargo

The consignor may be required, if necessary, to meet the formalities of customs, police and similar public authorities to deliver a document indicating the nature of the cargo. This provision creates for the carrier no duty, obligation or liability resulting therefrom.

### Article 7 - Description of air waybill

1. The air waybill shall be made out by the consignor in three original parts.

2. The first part shall be marked "for the carrier"; it shall be signed by the consignor. The second part shall be marked "for the consignee"; it shall be signed by the consignor and by the carrier. The third part shall be signed by the carrier who shall hand it to the consignor after the cargo has been accepted.

3. The signature of the carrier and that of the consignor may be printed or stamped.

4. If, at the request of the consignor, the carrier makes out the air waybill, the carrier shall be deemed, subject to proof to the contrary, to have done so on behalf of the consignor.

### Article 8 - Documentation for multiple packages

When there is more than one package:

(a) the carrier of cargo has the right to require the consignor to make out separate air waybills;

(b) the consignor has the right to require the carrier to deliver separate cargo receipts when the other means referred to in paragraph 2 of Article 4 are used.

### Article 9 - Non-compliance with documentary requirements

Non-compliance with the provisions of Articles 4 to 8 shall not affect the existence or the validity of the contract of carriage, which shall, nonetheless, be subject to the rules of this Convention including those relating to limitation of liability.

### Article 10 - Responsibility for particulars of documentation

1. The consignor is responsible for the correctness of the particulars and statements relating to the cargo inserted by it or on its behalf in the air waybill or furnished by it or on its behalf to the carrier for insertion in the cargo receipt or for insertion in the record preserved by the other means referred to in paragraph 2 of Article 4. The foregoing shall also apply where the person acting on behalf of the consignor is also the agent of the carrier.

2. The consignor shall indemnify the carrier against all damage suffered by it, or by any other person to whom the carrier is liable, by reason of the irregularity, incorrectness or incompleteness of the particulars and statements furnished by the consignor or on its behalf.

3. Subject to the provisions of paragraphs 1 and 2 of this Article, the carrier shall indemnify the consignor against all damage suffered by it, or by any other person to whom the consignor is liable, by reason of the irregularity, incorrectness or incompleteness of the particulars and statements inserted by the carrier or on its behalf in the cargo receipt or in the record preserved by the other means referred to in paragraph 2 of Article 4.

### Article 11 - Evidentiary value of documentation

1. The air waybill or the cargo receipt is prima facie evidence of the conclusion of the contract, of the acceptance of the cargo and of the conditions of carriage mentioned therein.

3

Convention for the Unification of Certain Rules for International Carriage by Air

2. Any statements in the air waybill or the cargo receipt relating to the weight, dimensions and packing of the cargo, as well as those relating to the number of packages, are prima facie evidence of the facts stated; those relating to the quantity, volume and condition of the cargo do not constitute evidence against the carrier except so far as they both have been, and are stated in the air waybill or the cargo receipt to have been, checked by it in the presence of the consignor, or relate to the apparent condition of the cargo.

**Article 12 - Right of disposition of cargo**

1. Subject to its liability to carry out all its obligations under the contract of carriage, the consignor has the right to dispose of the cargo by withdrawing it at the airport of departure or destination, or by stopping it in the course of the journey on any landing, or by calling for it to be delivered at the place of destination or in the course of the journey to a person other than the consignee originally designated, or by requiring it to be returned to the airport of departure. The consignor must not exercise this right of disposition in such a way as to prejudice the carrier or other consignors and must reimburse any expenses occasioned by the exercise of this right.

2. If it is impossible to carry out the instructions of the consignor, the carrier must so inform the consignor forthwith.

3. If the carrier carries out the instructions of the consignor for the disposition of the cargo without requiring the production of the part of the air waybill or the cargo receipt delivered to the latter, the carrier will be liable, without prejudice to its right of recovery from the consignor, for any damage which may be caused thereby to any person who is lawfully in possession of that part of the air waybill or the cargo receipt.

4. The right conferred on the consignor ceases at the moment when that of the consignee begins in accordance with Article 13. Nevertheless, if the

consignee declines to accept the cargo, or cannot be communicated with, the consignor resumes its right of disposition.

**Article 13 - Delivery of the cargo**

1. Except when the consignor has exercised its right under Article 12, the consignee is entitled, on arrival of the cargo at the place of destination, to require the carrier to deliver the cargo to it, on payment of the charges due and on complying with the conditions of carriage.

2. Unless it is otherwise agreed, it is the duty of the carrier to give notice to the consignee as soon as the cargo arrives.

3. If the carrier admits the loss of the cargo, or if the cargo has not arrived at the expiration of seven days after the date on which it ought to have arrived, the consignee is entitled to enforce against the carrier the rights which flow from the contract of carriage.

**Article 14 - Enforcement of the rights of consignor and consignee**

The consignor and the consignee can respectively enforce all the rights given to them by Articles 12 and 13, each in its own name, whether it is acting in its own interest or in the interest of another, provided that it carries out the obligations imposed by the contract of carriage.

**Article 15 - Relations of consignor and consignee or mutual relations of third parties**

1. Articles 12, 13 and 14 do not affect either the relations of the consignor and the consignee with each other or the mutual relations of third parties whose rights are derived either from the consignor or from the consignee.

2. The provisions of Articles 12, 13 and 14 can only be varied by express

4

Convention for the Unification of Certain Rules for International Carriage by Air

provision in the air waybill or the cargo receipt.

**Article 16 - Formalities of customs, police or other public authorities**

1. The consignor must furnish such information and such documents as are necessary to meet the formalities of customs, police and any other public authorities before the cargo can be delivered to the consignee. The consignor is liable to the carrier for any damage occasioned by the absence, insufficiency or irregularity of any such information or documents, unless the damage is due to the fault of the carrier, its servants or agents.

2. The carrier is under no obligation to enquire into the correctness or sufficiency of such information or documents.

## CHAPTER III - LIABILITY OF THE CARRIER AND EXTENT OF COMPENSATION FOR DAMAGE

**Article 17 - Death and injury of passengers - damage to baggage**

1. The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

2. The carrier is liable for damage sustained in case of destruction or loss of, or of damage to, checked baggage upon condition only that the event which caused the destruction, loss or damage took place on board the aircraft or during any period within which the checked baggage was in the charge of the carrier. However, the carrier is not liable if and to the extent that the damage resulted from the inherent defect, quality or vice of the baggage. In the case of unchecked baggage, including personal items, the carrier is liable if the damage resulted from its fault or that of its servants or agents.

3. If the carrier admits the loss of the checked baggage, or if the checked baggage has not arrived at the expiration of twenty-one days after the date on which it ought to have arrived, the passenger is entitled to enforce the carrier the rights which flow from the contract of carriage.

4. Unless otherwise specified, in this Convention the term "baggage" means both checked baggage and unchecked baggage.

**Article 18 - Damage to cargo**

1. The carrier is liable for damage sustained in the event of the destruction or loss of or damage to, cargo upon condition only that the event which caused the damage so sustained took place during the carriage by air.

2. However, the carrier is not liable if and to the extent it proves that the destruction, or loss of, or damage to, the cargo resulted from one or more of the following:

(a) inherent defect, quality or vice of that cargo;

(b) defective packing of that cargo performed by a person other than the carrier or its servants or agents;

(c) an act of war or an armed conflict;

(d) an act of public authority carried out in connection with the entry, exit or transit of the cargo.

3. The carriage by air within the meaning of paragraph 1 of this Article comprises the period during which the cargo is in the charge of the carrier.

4. The period of the carriage by air does not extend to any carriage by land, by sea or by inland waterway performed outside an airport. If, however, such carriage takes place in the performance of a contract for carriage by air, for the purpose of loading, delivery or transhipment, any damage

Convention for the Unification of Certain Rules for International Carriage by Air

is presumed, subject to proof to the contrary, to have been the result of an event which took place during the carriage by air. If a carrier, without the consent of the consignor, substitutes carriage by another mode of transport for the whole or part of a carriage intended by the agreement between the parties to be carriage by air, such carriage by another mode of transport is deemed to be within the period of carriage by air.

## Article 19 - Delay

The carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage or that it was impossible for it or them to take such measures.

## Article 20 - Exoneration

If the carrier proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of the person claiming compensation, or the person from whom he or she derives his or her rights, the carrier shall be wholly or partly exonerated from its liability to the claimant to the extent that such negligence or wrongful act or omission caused or contributed to the damage. When by reason of death or injury of a passenger compensation is claimed by a person other than the passenger, the carrier shall likewise be wholly or partly exonerated from its liability to the extent that it proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of that passenger. This Article applies to all the liability provisions in this Convention, including paragraph 1 of Article 21.

## Article 21 - Compensation in case of death or injury of passengers

1. For damages arising under paragraph 1 of Article 17 not exceeding 100,000 Special Drawing Rights for each passenger, the carrier shall not be able to exclude or limit its liability.

2. The carrier shall not be liable for damages arising under paragraph 1 of Article 17 to the extent that they exceed for each passenger 100,000 Special Drawing Rights if the carrier proves that:

(a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or

(b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

## Article 22 - Limits of liability in relation to delay, baggage and cargo

1. In the case of damage caused by delay as specified in Article 19 in the carriage of persons, the liability of the carrier for each passenger is limited to 4,150 Special Drawing Rights.

2. In the carriage of baggage, the liability of the carrier in the case of destruction, loss, damage or delay is limited to 1,000 Special Drawing Rights for each passenger unless the passenger has made, at the time when the checked baggage was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless it proves that the sum is greater than the passenger's actual interest in delivery at destination.

3. In the carriage of cargo, the liability of the carrier in the case of destruction, loss, damage or delay is limited to a sum of 17 Special Drawing Rights per kilogram, unless the consignor has made, at the time when the

Convention for the Unification of Certain Rules for International Carriage by Air

package was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless it proves that the sum is greater than the consignor's actual interest in delivery at destination.

4. In the case of destruction, loss, damage or delay of part of the cargo, or of any object contained therein, the weight to be taken into consideration in determining the amount to which the carrier's liability is limited shall be only the total weight of the package or packages concerned. Nevertheless, when the destruction, loss, damage or delay of a part of the cargo, or of an object contained therein, affects the value of other packages covered by the same air waybill, or the same receipt or, if they were not issued, by the same record preserved by the other means referred to in paragraph 2 of Article 4, the total weight of such package or packages shall also be taken into consideration in determining the limit of liability.

5. The foregoing provisions of paragraphs 1 and 2 of this Article shall not apply if it is proved that the damage resulted from an act or omission of the carrier, its servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result; provided that, in the case of such act or omission of a servant or agent, it is also proved that such servant or agent was acting within the scope of its employment.

6. The limits prescribed in Article 21 and in this Article shall not prevent the court from awarding, in accordance with its own law, in addition, the whole or part of the court costs and of the other expenses of the litigation incurred by the plaintiff, including interest. The foregoing provision shall not apply if the amount of the damages awarded, excluding court costs and other expenses of the litigation, does not exceed the sum which the carrier has offered in writing to the plaintiff within a period of six months from the date of the occurrence causing the damage, or before the commencement of the action, if that is later.

## Article 23 - Conversion of monetary units

1. The sums mentioned in terms of Special Drawing Right in this Convention shall be deemed to refer to the Special Drawing Right as defined by the International Monetary Fund. Conversion of the sums into national currencies shall, in case of judicial proceedings, be made according to the value of such currencies in terms of the Special Drawing Right at the date of the judgement. The value of a national currency, in terms of the Special Drawing Right, of a State Party which is a Member of the International Monetary Fund, shall be calculated in accordance with the method of valuation applied by the International Monetary Fund, in effect at the date of the judgement, for its operations and transactions. The value of a national currency, in terms of the Special Drawing Right, of a State Party which is not a Member of the International Monetary Fund, shall be calculated in a manner determined by that State.

2. Nevertheless, those States which are not Members of the International Monetary Fund and whose law does not permit the application of the provisions of paragraph 1 of this Article may, at the time of ratification or accession or at any time thereafter, declare that the limit of liability of the carrier prescribed in Article 21 is fixed at a sum of 1,500,000 monetary units per passenger in judicial proceedings in their territories; 62,500 monetary units per passenger with respect to paragraph 1 of Article 22; 15,000 monetary units per passenger with respect to paragraph 2 of Article 22; and 250 monetary units per kilogram with respect to paragraph 3 of Article 22. This monetary unit corresponds to sixty-five and a half milligrams of gold of millesimal fineness nine hundred. These sums may be converted into the national currency concerned in round figures. The conversion of these sums into national currency shall be made according to the law of the State concerned.

3. The calculation mentioned in the last sentence of paragraph 1 of this Article and the conversion method mentioned in paragraph 2 of this Article shall be made in such manner as to express in the national currency

Convention for the Unification of Certain Rules for International Carriage by Air

of the State Party as far as possible the same real value for the amounts in Articles 21 and 22 as would result from the application of the first three sentences of paragraph 1 of this Article. States Parties shall communicate to the depositary the manner of calculation pursuant to paragraph 1 of this Article, or the result of the conversion in paragraph 2 of this Article as the case may be, when depositing an instrument of ratification, acceptance, approval of or accession to this Convention and whenever there is a change in either.

## Article 24 - Review of limits

1. Without prejudice to the provisions of Article 25 of this Convention and subject to paragraph 2 below, the limits of liability prescribed in Articles 21, 22 and 23 shall be reviewed by the Depositary at five-year intervals, the first such review to take place at the end of the fifth year following the date of entry into force of this Convention, or if the Convention does not enter into force within five years of the date it is first open for signature, within the first year of its entry into force, by reference to an inflation factor which corresponds to the accumulated rate of inflation since the previous revision or in the first instance since the date of entry into force of the Convention. The measure of the rate of inflation to be used in determining the inflation factor shall be the weighted average of the annual rates of increase or decrease in the Consumer Price Indices of the States whose currencies comprise the Special Drawing Right mentioned in paragraph 1 of Article 23.

2. If the review referred to in the preceding paragraph concludes that the inflation factor has exceeded 10 percent, the Depositary shall notify States Parties of a revision of the limits of liability. Any such revision shall become effective six months after its notification to the States Parties. If within three months after its notification to the States Parties a majority of the States Parties register their disapproval, the revision shall not become effective and the Depositary shall refer the matter to a meeting

of the States Parties. The Depositary shall immediately notify all States Parties of the coming into force of any revision.

3. Notwithstanding paragraph 1 of this Article, the procedure referred to in paragraph 2 of this Article shall be applied at any time provided that one-third of the States Parties express a desire to that effect and upon condition that the inflation factor referred to in paragraph 1 has exceeded 30 percent since the previous revision or since the date of entry into force of this Convention if there has been no previous revision. Subsequent reviews using the procedure described in paragraph 1 of this Article will take place at five-year intervals starting at the end of the fifth year following the date of the reviews under the present paragraph.

## Article 25 - Stipulation on limits

A carrier may stipulate that the contract of carriage shall be subject to higher limits of liability than those provided for in this Convention or to no limits of liability whatsoever.

## Article 26 - Invalidity of contractual provisions

Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this Convention shall be null and void, but the nullity of any such provision does not involve the nullity of the whole contract, which shall remain subject to the provisions of this Convention.

## Article 27 - Freedom to contract

Nothing contained in this Convention shall prevent the carrier from refusing to enter into any contract of carriage, from waiving any defences available under the Convention, or from laying down conditions which do not conflict with the provisions of this Convention.

Convention for the Unification of Certain Rules for International Carriage by Air

**Article 28 - Advance payments**

In the case of aircraft accidents resulting in death or injury of passengers, the carrier shall, if required by its national law, make advance payments without delay to a natural person or persons who are entitled to claim compensation in order to meet the immediate economic needs of such persons. Such advance payments shall not constitute a recognition of liability and may be offset against any amounts subsequently paid as damages by the carrier.

**Article 29 - Basis of claims**

In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights. In any such action, punitive, exemplary or any other non-compensatory damages shall not be recoverable.

**Article 30 - Servants, agents - aggregation of claims**

1. If an action is brought against a servant or agent of the carrier arising out of damage to which the Convention relates, such servant or agent, if they prove that they acted within the scope of their employment, shall be entitled to avail themselves of the conditions and limits of liability which the carrier itself is entitled to invoke under this Convention.

2. The aggregate of the amounts recoverable from the carrier, its servants and agents, in that case, shall not exceed the said limits.

3. Save in respect of the carriage of cargo, the provisions of paragraphs 1 and 2 of this Article shall not apply if it is proved that the damage resulted from an act or omission of the servant or agent done with intent to cause

damage or recklessly and with knowledge that damage would probably result.

**Article 31 - Timely notice of complaints**

1. Receipt by the person entitled to delivery of checked baggage or cargo without complaint is prima facie evidence that the same has been delivered in good condition and in accordance with the document of carriage or with the record preserved by the other means referred to in paragraph 2 of Article 3 and paragraph 2 of Article 4.

2. In the case of damage, the person entitled to delivery must complain to the carrier forthwith after the discovery of the damage, and, at the latest, within seven days from the date of receipt in the case of checked baggage and fourteen days from the date of receipt in the case of cargo. In the case of delay, the complaint must be made at the latest within twenty-one days from the date on which the baggage or cargo have been placed at his or her disposal.

3. Every complaint must be made in writing and given or dispatched within the times aforesaid.

4. If no complaint is made within the times aforesaid, no action shall lie against the carrier, save in the case of fraud on its part.

**Article 32 - Death of person liable**

In the case of the death of the person liable, an action for damages lies in accordance with the terms of this Convention against those legally representing his or her estate.

**Article 33 - Jurisdiction**

1. An action for damages must be brought, at the option of the plaintiff,

Convention for the Unification of Certain Rules for International Carriage by Air

in the territory of one of the States Parties, either before the court of the domicile of the carrier or of its principal place of business, or where it has a place of business through which the contract has been made or before the court at the place of destination.

2. In respect of damage resulting from the death or injury of a passenger, an action may be brought before one of the courts mentioned in paragraph 1 of this Article, or in the territory of a State Party in which at the time of the accident the passenger has his or her principal and permanent residence and to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft or on another carrier's aircraft pursuant to a commercial agreement, and in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a commercial agreement.

3. For the purposes of paragraph 2,

(a) "commercial agreement" means an agreement, other than an agency agreement, made between carriers and relating to the provision of their joint services for carriage of passengers by air;

(b) "principal and permanent residence" means the one fixed and permanent abode of the passenger at the time of the accident. The nationality of the passenger shall not be the determining factor in this regard.

4. Questions of procedure shall be governed by the law of the court seized of the case.

**Article 34 - Arbitration**

1. Subject to the provisions of this Article, the parties to the contract of carriage for cargo may stipulate that any dispute relating to the liability of the carrier under this Convention shall be settled by arbitration. Such agreement shall be in writing.

2. The arbitration proceedings shall, at the option of the claimant, take

place within one of the jurisdictions referred to in Article 33.

3. The arbitrator or arbitration tribunal shall apply the provisions of this Convention.

4. The provisions of paragraphs 2 and 3 of this Article shall be deemed to be part of every arbitration clause or agreement, and any term of such clause or agreement which is inconsistent therewith shall be null and void.

**Article 35 - Limitation of actions**

1. The right to damages shall be extinguished if an action is not brought within a period of two years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the carriage stopped.

2. The method of calculating that period shall be determined by the law of the court seized of the case.

**Article 36 - Successive carriage**

1. In the case of carriage to be performed by various successive carriers and falling within the definition set out in paragraph 3 of Article 1, each carrier which accepts passengers, baggage or cargo is subject to the rules set out in this Convention and is deemed to be one of the parties to the contract of carriage in so far as the contract deals with that part of the carriage which is performed under its supervision.

2. In the case of carriage of this nature, the passenger or any person entitled to compensation in respect of him or her can take action only against the carrier which performed the carriage during which the accident or the delay occurred, save in the case where, by express agreement, the first carrier has assumed liability for the whole journey.

3. As regards baggage or cargo, the passenger or consignor will have a

Convention for the Unification of Certain Rules for International Carriage by Air

right of action against the first carrier, and the passenger or consignee who is entitled to delivery will have a right of action against the last carrier, and further, each may take action against the carrier which performed the carriage during which the destruction, loss, damage or delay took place. These carriers will be jointly and severally liable to the passenger or to the consignor or consignee.

### Article 37 - Right of recourse against third parties

Nothing in this Convention shall prejudice the question whether a person liable for damage in accordance with its provisions has a right of recourse against any other person.

## CHAPTER IV - COMBINED CARRIAGE

### Article 38 - Combined carriage

1. In the case of combined carriage performed partly by air and partly by any other mode of carriage, the provisions of this Convention shall, subject to paragraph 4 of Article 18, apply only to the carriage by air, provided that the carriage by air falls within the terms of Article 1.

2. Nothing in this Convention shall prevent the parties in the case of combined carriage from inserting in the document of air carriage conditions relating to other modes of carriage, provided that the provisions of this Convention are observed as regards the carriage by air.

## CHAPTER V - CARRIAGE BY AIR PERFORMED BY A PERSON OTHER THAN THE CONTRACTING CAR-RIER

### Article 39 - Contracting carrier - actual carrier

The provisions of this Chapter apply when a person (hereinafter referred to as "the contracting carrier") as a principal makes a contract of carriage governed by this Convention with a passenger or consignor or with a person acting on behalf of the passenger or consignor, and another person (hereinafter referred to as "the actual carrier") performs, by virtue of authority from the contracting carrier, the whole or part of the carriage, but is not with respect to such part a successive carrier within the meaning of this Convention. Such authority shall be presumed in the absence of proof to the contrary.

### Article 40 - Respective liability of contracting and actual carriers

If an actual carrier performs the whole or part of carriage which, according to the contract referred to in Article 39, is governed by this Convention, both the contracting carrier and the actual carrier shall, except as otherwise provided in this Chapter, be subject to the rules of this Convention, the former for the whole of the carriage contemplated in the contract, the latter solely for the carriage which it performs.

### Article 41 - Mutual liability

1. The acts and omissions of the actual carrier and of its servants and agents acting within the scope of their employment shall, in relation to the carriage performed by the actual carrier, be deemed to be also those of the contracting carrier.

Convention for the Unification of Certain Rules for International Carriage by Air

2. The acts and omissions of the contracting carrier and of its servants and agents acting within the scope of their employment shall, in relation to the carriage performed by the actual carrier, be deemed to be also those of the actual carrier. Nevertheless, no such act or omission shall subject the actual carrier to liability exceeding the amounts referred to in Articles 21, 22, 23 and 24. Any special agreement under which the contracting carrier assumes obligations not imposed by this Convention or any waiver of rights or defences conferred by this Convention or any special declaration of interest in delivery at destination contemplated in Article 22 shall not affect the actual carrier unless agreed to by it.

## Article 42 - Addressee of complaints and instructions

Any complaint to be made or instruction to be given under this Convention to the carrier shall have the same effect whether addressed to the contracting carrier or to the actual carrier. Nevertheless, instructions referred to in Article 12 shall only be effective if addressed to the contracting carrier.

## Article 43 - Servants and agents

In relation to the carriage performed by the actual carrier, any servant or agent of that carrier or of the contracting carrier shall, if they prove that they acted within the scope of their employment, be entitled to avail themselves of the conditions and limits of liability which are applicable under this Convention to the carrier whose servant or agent they are, unless it is proved that they acted in a manner that prevents the limits of liability from being invoked in accordance with this Convention.

## Article 44 - Aggregation of damages

In relation to the carriage performed by the actual carrier, the aggregate

of the amounts recoverable from that carrier and the contracting carrier, and from their servants and agents acting within the scope of their employment, shall not exceed the highest amount which could be awarded against either the contracting carrier or the actual carrier under this Convention, but none of the persons mentioned shall be liable for a sum in excess of the limit applicable to that person.

## Article 45 - Addressee of claims

In relation to the carriage performed by the actual carrier, an action for damages may be brought, at the option of the plaintiff, against that carrier or the contracting carrier, or against both together or separately. If the action is brought against only one of those carriers, that carrier shall have the right to require the other carrier to be joined in the proceedings, the procedure and effects being governed by the law of the court seized of the case.

## Article 46 - Additional jurisdiction

Any action for damages contemplated in Article 45 must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before a court in which an action may be brought against the contracting carrier, as provided in Article 33, or before the court having jurisdiction at the place where the actual carrier has its domicile or its principal place of business.

## Article 47 - Invalidity of contractual provisions

Any contractual provision tending to relieve the contracting carrier or the actual carrier of liability under this Chapter or to fix a lower limit than that which is applicable according to this Chapter shall be null and void, but the nullity of any such provision does not involve the nullity of the

Convention for the Unification of Certain Rules for International Carriage by Air

whole contract, which shall remain subject to the provisions of this Chapter.

**Article 48 - Mutual relations of contracting and actual carriers**

Except as provided in Article 45, nothing in this Chapter shall affect the rights and obligations of the carriers between themselves, including any right of recourse or indemnification.

## CHAPTER VI - OTHER PROVISIONS

**Article 49 - Mandatory application**

Any clause contained in the contract of carriage and all special agreements entered into before the damage occurred by which the parties purport to infringe the rules laid down by this Convention, whether by deciding the law to be applied, or by altering the rules as to jurisdiction, shall be null and void.

**Article 50 - Insurance**

States Parties shall require their carriers to maintain adequate insurance covering their liability under this Convention. A carrier may be required by the State Party into which it operates to furnish evidence that it maintains adequate insurance covering its liability under this Convention.

**Article 51 - Carriage performed in extraordinary circumstances**

The provisions of Articles 3 to 5, 7 and 8 relating to the documentation of carriage shall not apply in the case of carriage performed in extraordinary circumstances outside the normal scope of a carrier's business.

**Article 52 - Definition of days**

The expression "days" when used in this Convention means calendar days, not working days.

## CHAPTER VII - FINAL CLAUSES

**Article 53 - Signature, ratification and entry into force**

1. This Convention shall be open for signature in Montreal on 28 May 1999 by States participating in the International Conference on Air Law held at Montreal from 10 to 28 May 1999. After 28 May 1999, the Convention shall be open to all States for signature at the headquarters of the International Civil Aviation Organization in Montreal until it enters into force in accordance with paragraph 6 of this Article.

2. This Convention shall similarly be open for signature by Regional Economic Integration Organisations. For the purpose of this Convention, a "Regional Economic Integration Organisation" means any organisation which is constituted by sovereign States of a given region which has competence in respect of certain matters governed by this Convention and has been duly authorized to sign and to ratify, accept, approve or accede to this Convention. A reference to a "State Party" or "States Parties" in this Convention, otherwise than in paragraph 2 of Article 1, paragraph 1(b) of Article 3, paragraph (b) of Article 5, Articles 23, 33, 46 and paragraph (b) of Article 57, applies equally to a Regional Economic Integration Organisation. For the purpose of Article 24, the references to "a majority of the States Parties" and "one-third of the States Parties" shall not apply to a Regional Economic Integration Organisation.

3. This Convention shall be subject to ratification by States and by Regional Economic Integration Organisations which have signed it.

4. Any State or Regional Economic Integration Organisation which does

13

Convention for the Unification of Certain Rules for International Carriage by Air

not sign this Convention may accept, approve or accede to it at any time.

5. Instruments of ratification, acceptance, approval or accession shall be deposited with the International Civil Aviation Organization, which is hereby designated the Depositary.

6. This Convention shall enter into force on the sixtieth day following the date of deposit of the thirtieth instrument of ratification, acceptance, approval or accession with the Depositary between the States which have deposited such instrument. An instrument deposited by a Regional Economic Integration Organisation shall not be counted for the purpose of this paragraph.

7. For other States and for other Regional Economic Integration Organisations, this Convention shall take effect sixty days following the date of deposit of the instrument of ratification, acceptance, approval or accession.

8. The Depositary shall promptly notify all signatories and States Parties of:

(a) each signature of this Convention and date thereof;

(b) each deposit of an instrument of ratification, acceptance, approval or accession and date thereof;

(c) the date of entry into force of this Convention;

(d) the date of the coming into force of any revision of the limits of liability established under this Convention;

(e) any denunciation under Article 54.

Article 54 - Denunciation

1. Any State Party may denounce this Convention by written notification to the Depositary.

2. Denunciation shall take effect one hundred and eighty days following the date on which notification is received by the Depositary.

Article 55 - Relationship with other Warsaw Convention instruments

This Convention shall prevail over any rules which apply to international carriage by air:

1. between States Parties to this Convention by virtue of those States commonly being Party to

(a) the Convention for the Unification of Certain Rules relating to International Carriage by Air signed at Warsaw on 12 October 1929 (hereinafter called the Warsaw Convention);

(b) the Protocol to amend the Convention for the Unification of Certain Rules relating to International Carriage by Air signed at Warsaw on 12 October 1929, done at The Hague on 28 September 1955 (hereinafter called The Hague Protocol);

(c) the Convention, Supplementary to the Warsaw Convention, for the Unification of Certain Rules relating to International Carriage by Air Performed by a Person other than the Contracting Carrier, signed at Guadalajara on 18 September 1961 (hereinafter called the Guadalajara Convention);

(d) the Protocol to amend the Convention for the Unification of Certain Rules relating to International Carriage by Air signed at Warsaw on 12 October 1929 as amended by the Protocol done at The Hague on 28 September 1955, signed at Guatemala City on 8 March 1971 (hereinafter called the Guatemala City Protocol);

(e) Additional Protocol Nos. 1 to 3 and Montreal Protocol No. 4 to amend the Warsaw Convention as amended by The Hague Protocol or the Warsaw Convention as amended by both The Hague Protocol and the

14

Convention for the Unification of Certain Rules for International Carriage by Air

Guatemala City Protocol, signed at Montreal on 25 September 1975 (hereinafter called the Montreal Protocols); or

2. within the territory of any single State Party to this Convention by virtue of that State being Party to one or more of the instruments referred to in sub-paragraphs (a) to (e) above.

**Article 56 - States with more than one system of law**

1. If a State has two or more territorial units in which different systems of law are applicable in relation to matters dealt with in this Convention, it may at the time of signature, ratification, acceptance, approval or accession declare that this Convention shall extend to all its territorial units or only to one or more of them and may modify this declaration by submitting another declaration at any time.

2. Any such declaration shall be notified to the Depositary and shall state expressly the territorial units to which the Convention applies.

3. In relation to a State Party which has made such a declaration:

(a) references in Article 23 to "national currency" shall be construed as referring to the currency of the relevant territorial unit of that State; and

(b) the reference in Article 28 to "national law" shall be construed as referring to the law of the relevant territorial unit of that State.

**Article 57 - Reservations**

No reservation may be made to this Convention except that a State Party may at any time declare by a notification addressed to the Depositary that this Convention shall not apply to:

(a) international carriage by air performed and operated directly by that

State Party for non-commercial purposes in respect to its functions and duties as a sovereign State; and/or

(b) the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by that State Party, the whole capacity of which has been reserved by or on behalf of such authorities.

IN WITNESS WHEREOF the undersigned Plenipotentiaries, having been duly authorized, have signed this Convention.

DONE at Montreal on the 28th day of May of the year one thousand nine hundred and ninety-nine in the English, Arabic, Chinese, French, Russian and Spanish languages, all texts being equally authentic. This Convention shall remain deposited in the archives of the International Civil Aviation Organization, and certified copies thereof shall be transmitted by the Depositary to all States Parties to this Convention, as well as to all States Parties to the Warsaw Convention, The Hague Protocol, the Guadalajara Convention, the Guatemala City Protocol and the Montreal Protocols.

[Signatures]

Convention for the Unification of Certain Rules for International Carriage by Air

## META DOCUMENT INFORMATION (METADATA)

### Metadata

Document Manifest @

< http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/lmu_manifest.html >

### Dublin Core (DC)

*DC tags included with this document are provided here.*

DC Title: Convention for the Unification of Certain Rules for International Carriage by Air - Montreal, 28 May 1999

DC Date: 1999-05-28

DC Type: international convention multilateral

description: Convention for the Unification of Certain Rules for International Carriage by Air, Montreal, 1999

### Version Information

Sourcefile: air.carriage.unification.convention.montreal.1999.lm3

Filetype: SiSU text 0.38

Sourcefile Digest, MD5(air.carriage.unification.convention.montreal.1999.sst)= e034bdd9b9be426a8f6af21d1d5dbdc3b

Skin_Digest: MD5(skin_lm.rb)= 1f1cdf73fb20daacc0cbdc62b1035bd3

### Generated

Document (metaverse) last generated:    Fri Jul 12  23:03:54  +0100 2007

Generated by: SiSU 0.61.0 of 2007w41/5 (2007-10-12)

Ruby version:  ruby 1.8.6 (2007-06-07 patchlevel 36) [i486-linux]

## Information on this document copy and an unofficial List of Some web related information and sources

"Support Open Standards and Software Libre for the Information Technology Infrastructure" RA

### Information on this document copy www.lexmercatoria.org

Generated by SiSU found at www.jus.uio.no/sisu ( sisu sisu sisu www.sisudoc.org ). SiSU is software for document structuring, publishing and search (using SiSU: object citation numbering, markup, meta-markup, and system) Copyright © 1997, current 2007 Ralph Amissah, All Rights Reserved.

SiSU is released under GPL 3 or later (www.fsf.org/licenses/gpl.html).

**SiSU** SiSU 1997, current 2007.

W3 since October 3 1993

Lex Mercatoria presentations at www.lexmercatoria.org

Convention for the Unification of Certain Rules for International Carriage by Air pdf versions can be found at:

http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/portrait.pdf
http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/landscape.pdf

Convention for the Unification of Certain Rules for International Carriage by Air html versions may be found at:

http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/toc.html OR
http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/doc.html

SiSU Manifest of document output and metadata may be found at:

http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/sisu_manifest.html

Lex Mercatoria found at: www.lexmercatoria.org

www.lexmercatoria.org

16

SiSU

Convention for the Unification of Certain Rules for International Carriage by Air

Links that may be of interest at Lex Mercatoria and elsewhere:

Air Carriage
(www.lexmercatoria.org)
http://www.jus.uio.no/lm/transport.and.carriage.of.goods/air.html

Transport
(www.lexmercatoria.org)
http://www.jus.uio.no/lm/transport.and.carriage.of.goods/toc.html

Lex Mercatoria home:
www.lexmercatoria.org

www.lexmercatoria.org

# EXHIBIT "B"

# SECTION   2


# MULTILATERAL   TREATIES
# AND   OTHER   AGREEMENTS



# AVIATION

## (See also INTERNATIONAL CIVIL AVIATION ORGANIZATION)

Convention for the unification of certain rules relating to international transportation by air, with additional protocol. Concluded at Warsaw October 12, 1929; entered into force February 13, 1933; for the United States October 29, 1934.
49 Stat. 3000; TS 876; 2 Bevans 983; 137 LNTS 11.

States which are parties:
Afghanistan
Algeria
Angola
Argentina
Armenia
Australia [1]
Austria
Azerbaijan
Bahamas, The
Bahrain
Bangladesh
Barbados
Belarus
Belgium
Benin
Bolivia
Bosnia-Herzegovina
Botswana
Brazil
Brunei
Bulgaria
Burkina Faso
Burma
Cambodia
Cameroon
Canada [2]
Cape Verde
Chile [2]
China [3]
Colombia
Comoros
Congo [2]
Congo, Democratic Republic of the
Costa Rica
Cote d'Ivoire
Croatia
Cuba [2]
Cyprus
Czech Republic
Denmark, not including Greenland
Dominican Republic
Ecuador
Egypt
Equatorial Guinea
Estonia
Ethiopia [2] [4]
Fiji
Finland
France, including French colonies
Gabon
German Democratic Republic [5]
Germany, Federal Republic of [5]
Ghana
Greece
Guatemala
Guinea
Honduras

Hungary
Iceland
India
Indonesia
Iran
Iraq
Ireland
Israel
Italy
Japan
Jordan
Kenya
Korea, Democratic People's Republic of
Kuwait
Kyrgyz Republic
Laos
Latvia
Lebanon
Lesotho
Liberia
Libya
Liechtenstein
Luxembourg
Macedonia
Madagascar
Malawi
Malaysia [2]
Maldives
Mali
Malta
Mauritania
Mauritius
Mexico
Moldova
Mongolia
Morocco
Nauru
Nepal
Netherlands [6]
New Zealand
Niger
Nigeria
Norway
Oman
Pakistan [2]
Panama
Papua New Guinea
Paraguay
Peru
Philippines [2]
Poland
Portugal
Qatar
Romania
Russian Federation
Rwanda
St. Vincent and the Grenadines
Saudi Arabia
Senegal
Serbia and Montenegro
Seychelles
Sierra Leone
Singapore
Slovak Republic
Slovenia
Solomon Islands
South Africa [7]
Spain
Sri Lanka
Sudan
Suriname
Sweden
Switzerland
Syrian Arab Republic
Tanzania

Togo
Tonga
Trinidad and Tobago
Tunisia
Turkey
Turkmenistan
Uganda
Ukraine
Union of Soviet Socialist Republics [8]
United Arab Emirates
United Kingdom [9]
United States [2]
Uruguay
Uzbekistan
Vanuatu
Venezuela [2]
Vietnam, Socialist Republic of
Western Samoa
Yemen (Sanaa) [10]
Zambia
Zimbabwe

NOTES:
[1] Extended to Norfolk Island.
[2] With reservation.
[3] Applicable to Hong Kong and Macao. See note under CHINA in Section 1.
[4] See note under ETHIOPIA in Section 1.
[5] See note under GERMANY, FEDERAL REPUBLIC OF in Section 1.
[6] Applicable to Aruba and Netherlands Antilles.
[7] Extended to Namibia.
[8] See note under UNION OF SOVIET SOCIALIST REPUBLICS in Section 1.
[9] Extended to Sovereign Base Areas of Akrotiri and Dhekelai, Ascension Island, Bermuda, Cayman Islands, Falkland Islands and dependencies, Gibraltar, Montserrat, St. Helena, and Turks and Caicos Islands.
[10] See note under YEMEN in Section 1.

Protocol to amend the Convention for the unification of certain rules relating to international carriage by air signed at Warsaw on October 12, 1929. Done at The Hague September 28, 1955; entered into force August 1, 1963; for the United States December 14, 2003.
TIAS
States which are parties:
Afghanistan
Algeria
Angola
Argentina
Australia
Austria
Azerbaijan
Bahamas
Bahrain
Bangladesh
Belarus
Belgium
Benin
Bosnia-Herzegovina
Brazil
Bulgaria
Cambodia
Cameroon
Canada
Cape Verde
Chile
China
Colombia
Congo [1]
Costa Rica

 

## AVIATION (Cont'd)

Cote d'Ivoire
Croatia
Cuba
Cyprus
Czech Republic
Denmark
Dominican Republic
Ecuador
Egypt
El Salvador
Estonia
Fiji
Finland
France
Gabon
German Democratic Republic
Germany, Federal Republic of
Ghana
Greece
Grenada
Guatemala
Guinea
Hungary
Iceland
India
Iran
Iraq
Ireland
Israel
Italy
Japan
Jordan
Kazakhstan
Kenya
Korea, Democratic People's Republic of
Korea, Republic of
Kuwait
Kyrgyzstan
Laos
Latvia
Lebanon
Lesotho
Libya
Liechtenstein
Lithuania
Luxembourg
Macedonia
Madagascar
Malawi
Malaysia [1]
Maldives
Mali
Mauritius
Mexico
Moldova
Monaco
Morocco
Nauru
Nepal
Netherlands
New Zealand
Niger
Nigeria
Norway
Oman
Pakistan
Panama
Papua New Guinea
Paraguay
Peru
Philippines

Poland
Portugal
Qatar
Romania
Russian Federation
Rwanda
St. Vincent and the Grenadines
Samoa
Saudi Arabia
Senegal
Serbia and Montenegro
Seychelles
Singapore
Slovak Republic
Slovenia
Solomon Islands
South Africa
Spain
Sri Lanka
Sudan
Suriname
Swaziland
Sweden
Switzerland
Syria
Togo
Tonga
Trinidad and Tobago
Tunisia
Turkey
Ukraine
Union of Soviet Socialist Republics [2]
United Arab Emirates
United Kingdom
United States
Uzbekistan
Vanuatu
Venezuela [1]
Vietnam
Yemen
Zambia
Zimbabwe

NOTES:
    [1] With reservation(s).
    [2] See note under UNION OF SOVIET SOCIALIST REPUBLICS in Section 1.

Montreal Protocol No. 4 to amend the Convention for the unification of certain rules relating to international carriage by air, signed at Warsaw on October 12, 1929, as amended by the Protocol, done at The Hague on September 28, 1955. Done at Montreal September 25, 1975; entered into force June 14, 1998; for the United States March 4, 1999.
TIAS
States which are parties:
Argentina [1]
Australia
Azerbaijan
Bahrain
Belgium
Bosnia-Herzegovina
Brazil
Canada [2]
Colombia
Croatia
Cyprus
Denmark
Ecuador
Egypt
Estonia
Ethiopia
Finland

Ghana
Greece
Guatemala
Guinea
Honduras
Hungary
Iceland
Ireland
Israel
Italy
Japan
Jordan
Kenya
Kuwait
Lebanon
Macedonia
Mauritius
Nauru
Netherlands [3]
New Zealand [4]
Niger
Norway
Oman
Portugal
Serbia and Montenegro
Singapore
Slovenia
Spain
Sweden
Switzerland [5]
Togo
Turkey
United Arab Emirates
United Kingdom [1,6]
United States
Uzbekistan

NOTES:
    [1] With declaration.
    [2] With reservation in respect of Art. XXI, paragraph 1(a).
    [3] Applicable to the Kingdom in Europe and the Netherlands Antilles.
    [4] Extended to Tokelau.
    [5] With reservation in respect of Art. XXI, paragraph 1(b).
    [6] Extended to the Bailiwick of Jersey; the Bailiwick of Guernsey; the Isle of Man; Anguilla; Bermuda; British Antarctic Territory; British Indian Ocean Territory; British Virgin Islands; Cayman Islands; Falkland Islands and dependencies; Gibraltar; Montserrat; Pitcairn, Henderson, Ducie and Oeno Islands; Saint Helena and dependencies; Turks and Caicos Islands; and United Kingdom Sovereign Base Areas of Akrotiri and Dhekelia in the Island of Cyprus.

International air services transit agreement.[1] Signed at Chicago, December 7, 1944;[2] entered into force January 30, 1945; for the United States February 8, 1945.
59 Stat. 1693; EAS 487; 3 Bevans 916; 84 UNTS 389.
States which are parties:
Afghanistan
Albania
Algeria
Antigua and Barbuda
Argentina
Armenia
Australia
Austria
Azerbaijan
Bahamas

 

## AVIATION (Cont'd)

Bahrain
Bangladesh
Barbados
Belgium
Benin
Bolivia
Bosnia-Herzegovina
Brunei
Bulgaria
Burkina Faso
Burundi
Cameroon
Chile
Cook Islands
Costa Rica
Cote d'Ivoire
Croatia
Cuba
Cyprus
Czech Republic
Denmark
Ecuador
Egypt
El Salvador
Estonia
Ethiopia [3]
Fiji
Finland
France
Gabon
Georgia
German Democratic Republic [4]
Germany, Federal Republic of [4]
Greece
Guatemala
Guinea
Guyana
Honduras
Hong Kong [5]
Hungary
Iceland
India
Iran
Iraq
Ireland
Israel
Italy
Jamaica
Japan
Jordan
Korea, Democratic People's Republic of
Korea, Republic of
Kuwait
Latvia
Lebanon
Lesotho
Liberia
Luxembourg
Macao [5]
Macedonia
Madagascar
Malawi
Malaysia
Mali
Malta
Mauritania
Mauritius
Mexico
Moldova
Monaco
Mongolia

Morocco
Nauru
Nepal
Netherlands
New Zealand
Nicaragua
Niger
Nigeria
Norway
Oman
Pakistan
Palau
Panama
Paraguay
Philippines [6]
Poland
Portugal
Rwanda
Senegal
Serbia and Montenegro
Seychelles
Singapore
Slovak Republic
Slovenia
Somalia
South Africa
Spain
Sri Lanka
Swaziland
Sweden
Switzerland
Syria
Thailand
Togo
Trinidad and Tobago
Tunisia
Turkey
Ukraine
United Arab Emirates
United Kingdom
United States [1]
Uzbekistan
Vanuatu
Venezuela
Yugoslavia [7]
Zambia

NOTES:
[1] Applicable to all territories.
[2] For the convention on international civil aviation of the same date, see INTER-NATIONAL CIVIL AVIATION ORGANIZATION (TIAS 1591).
[3] See note under ETHIOPIA in Section 1.
[4] See note under GERMANY, FEDERAL REPUBLIC OF in Section 1.
[5] CHINA is not a party to this treaty but has made it applicable to Hong Kong and Macao.
[6] With reservation.
[7] See note under YUGOSLAVIA in Section 1.

Convention on the international recognition of rights in aircraft. Done at Geneva June 19, 1948; entered into force September 17, 1953. 4 UST 1830; TIAS 2847; 310 UNTS 151.
States which are parties:
Algeria
Angola
Argentina
Azerbaijan
Bahrain
Bangladesh
Belgium
Bolivia
Bosnia-Herzegovina

Brazil
Cameroon
Central African Republic
Chad
Chile
China [1]
Congo
Cote d'Ivoire
Croatia
Cuba
Czech Republic
Denmark
Ecuador
Egypt
El Salvador
Estonia
Ethiopia [2]
France
Gabon
Gambia
Germany, Federal Republic of [3]
Ghana
Greece
Grenada
Guatemala
Guinea
Haiti
Hungary
Iceland
Iraq
Italy
Kenya
Kuwait
Kyrgyz Republic
Laos
Lebanon
Libya
Luxembourg
Macedonia
Madagascar
Maldives
Mali
Mauritania
Mauritius
Mexico [4]
Monaco
Morocco
Netherlands [4] [5]
Niger
Nigeria
Norway
Oman
Pakistan
Panama
Paraguay
Philippines
Portugal
Romania
Rwanda
Senegal
Serbia and Montenegro
Seychelles
Slovenia
South Africa
Sri Lanka
Suriname
Sweden
Switzerland
Tajikistan
Thailand
Togo
Tunisia
Turkmenistan
United States
Uruguay

 

## AVIATION (Cont'd)

Uzbekistan
Vietnam
Yugoslavia [6]
Zimbabwe

NOTES:
[1] Applicable to Macao. See note under CHINA in Section 1.
[2] See note under ETHIOPIA in Section 1.
[3] See note under GERMANY, FEDERAL REPUBLIC OF in Section 1.
[4] With reservation. The United States and The Netherlands are unable to accept the reservation made by Mexico and do not regard the convention as in force between Mexico and their governments.
[5] Only for the Kingdom in Europe.
[6] See note under YUGOSLAVIA in Section 1.

Agreement on the joint financing of certain air navigation services in Iceland. Done at Geneva September 25, 1956; entered into force June 6, 1958.
9 UST 711; TIAS 4048; 334 UNTS 13

Amendments:
March 27, 1975 (26 UST 1630; TIAS 8122).
September 27, 1979 (31 UST 5570; TIAS 9673).
November 3, 1982 (TIAS 11534).

Agreement on the joint financing of certain air navigation services in Greenland and the Faroe Islands. Done at Geneva September 25, 1956; entered into force June 6, 1958.
9 UST 795; TIAS 4049; 334 UNTS 89
States which are parties:
Belgium
Canada
Cuba
Czechoslovakia [1]
Denmark
Finland
France
Germany, Federal Republic of [2]
Greece
Iceland
Ireland
Italy
Japan [3]
Lebanon
Netherlands
Norway
Sweden
Switzerland
United Kingdom
United States [4]

Amendments:
June 4, 1963 (14 UST 874; TIAS 5369).
June 14, 1974 (27 UST 4013; TIAS 8421)
September 27, 1979 (31 UST 5570; TIAS 9673).
November 3, 1982 (TIAS 11533).

NOTES:
[1] See note under CZECHOSLOVAKIA in Section 1.
[2] See note under GERMANY, FEDERAL REPUBLIC OF in Section 1
[3] With reservation(s)

* Subject to the availability of funds.

Convention on offenses and certain other acts committed on board aircraft. Done at Tokyo September 14, 1963; entered into force December 4, 1969.
20 UST 2941; TIAS 6768; 704 UNTS 219.
States which are parties:
Afghanistan
Albania
Algeria
Angola
Antigua and Barbuda
Argentina
Armenia
Australia
Austria
Azerbaijan [1]
Bahamas, The
Bahrain [1]
Bangladesh
Barbados
Belarus [1] [2]
Belgium
Belize
Benin
Bhutan
Bolivia
Bosnia-Herzegovina
Botswana
Brazil
Brunei
Bulgaria [3]
Burkina Faso
Burma
Burundi
Cambodia
Cameroon
Canada
Cape Verde
Central African Republic
Chad
Chile
China [1] [3] [4] [5]
Colombia
Comoros
Congo
Congo, Democratic Republic of the
Cook Islands
Costa Rica
Cote d'Ivoire
Croatia
Cuba [1]
Cyprus
Czech Republic
Denmark
Djibouti
Dominican Republic
Ecuador
Egypt [1]
El Salvador
Equatorial Guinea
Estonia
Ethiopia [1] [6]
Fiji
Finland
France
Gabon
Gambia, The
Georgia
German Democratic Republic [1] [7]
Germany, Federal Republic of [3]
Ghana
Greece
Grenada

Guatemala [1]
Guinea
Guyana
Haiti
Honduras [1]
Hungary
Iceland
India [1]
Indonesia [1]
Iran
Iraq
Ireland
Israel
Italy
Jamaica
Japan
Jordan
Kazakhstan
Kenya
Korea, Democratic People's Republic of [1]
Korea, Republic of
Kuwait [3]
Kyrgyz Republic
Laos
Latvia
Lebanon
Lesotho
Liberia
Libya
Liechtenstein
Lithuania
Luxembourg
Macedonia
Madagascar
Malawi [1]
Malaysia
Maldives
Mali
Malta
Marshall Islands [1]
Mauritania
Mauritius
Mexico
Moldova
Monaco
Mongolia
Morocco [3]
Mozambique [1]
Nauru
Nepal
Netherlands [8]
New Zealand
Nicaragua
Niger
Nigeria
Norway
Oman [3]
Pakistan
Palau
Panama
Papua New Guinea [1]
Paraguay
Peru [1]
Philippines
Poland
Portugal
Qatar
Romania [1]
Russian Federation
Rwanda
St. Lucia
St. Vincent and the Grenadines
Samoa
Saudi Arabia
Senegal

 

TREATIES IN FORCE 2006                                      381

## AVIATION (Cont'd)

Serbia and Montenegro
Seychelles
Sierra Leone
Singapore
Slovak Republic
Slovenia
Solomon Islands
South Africa [1]
Spain
Sri Lanka
Sudan
Suriname
Swaziland
Sweden
Switzerland
Syrian Arab Republic [1]
Tajikistan
Tanzania
Thailand
Togo
Tonga
Trinidad and Tobago
Tunisia [1]
Turkey
Turkmenistan
Uganda
Ukraine [1 2]
Union of Soviet Socialist Republics [1 2 10]
United Arab Emirates [1]
United Kingdom [11]
United States
Uruguay
Uzbekistan
Vanuatu
Venezuela [1]
Vietnam, Socialist Republic of [1]
Yemen (Sanaa) [12]
Yugoslavia [13]
Zambia
Zimbabwe

NOTES:

[1] With reservation.

[2] With statement(s).

[3] With declaration.

[4] The Taiwan authorities have also adhered to this convention. See note under CHINA (TAIWAN) in Section 1.

[5] Applicable to Hong Kong and Macao. See note under CHINA in Section 1.

[6] See note under ETHIOPIA in Section 1.

[7] See note under GERMANY, FEDERAL REPUBLIC OF in Section 1.

[8] On October 15, 1986 the Compact of Free Association entered into force between the Government of the United States and the Government of the Republic of the Marshall Islands, effective October 21, 1986.

[9] Applicable to the Netherlands Antilles and Aruba.

[10] See note under UNION OF SOVIET SOCIALIST REPUBLICS in Section 1.

[11] Extended to Anguilla.

[12] See note under YEMEN in Section 1.

[13] See note under YUGOSLAVIA in Section 1.

Convention for the suppression of unlawful seizure of aircraft (Hijacking). Done at The Hague December 16, 1970; entered into force October 14, 1971.
22 UST 1641, TIAS 7192.
States which are parties:
Afghanistan
Albania
Algeria [1]
Andorra
Angola
Antigua and Barbuda
Argentina [2]
Armenia
Australia
Austria
Azerbaijan
Bahamas, The
Bahrain [1]
Bangladesh
Barbados
Belarus [1]
Belgium
Belize
Benin
Bhutan
Bolivia
Bosnia-Herzegovina
Botswana
Brazil [1]
Brunei
Bulgaria
Burkina Faso
Burma
Burundi
Cambodia
Cameroon
Canada
Cape Verde
Central African Republic
Chad
Chile
China [1 2 4]
Colombia
Comoros
Congo
Congo, Democratic Republic of the
Cook Islands
Costa Rica
Cote d'Ivoire
Croatia
Cuba [1]
Cyprus
Czech Republic
Denmark [1 6]
Djibouti
Dominica
Dominican Republic
Ecuador
Egypt [1]
El Salvador
Equatorial Guinea
Estonia
Ethiopia [1 7]
Fiji
Finland
France
Gabon
Gambia, The
Georgia
German Democratic Republic [1]
Germany, Federal Republic of [8]
Ghana
Greece
Grenada
Guatemala [1]
Guinea

Guinea-Bissau
Guyana
Haiti
Honduras [1]
Hungary
Iceland
India [1]
Indonesia [1]
Iran
Iraq
Ireland
Israel
Italy
Jamaica
Japan
Jordan
Kazakhstan
Kenya
Korea, Democratic People's Republic of [1]
Korea, Republic of
Kuwait [1]
Kyrgyz Republic
Laos
Latvia
Lebanon
Lesotho
Liberia
Libya
Liechtenstein
Lithuania
Luxembourg
Macedonia
Madagascar
Malawi [1]
Malaysia
Maldives
Mali
Malta
Marshall Islands [9]
Mauritania
Mauritius
Mexico
Moldova
Monaco
Mongolia [1]
Morocco [1]
Mozambique [1]
Namibia
Nauru
Nepal
Netherlands [10]
New Zealand
Nicaragua
Niger
Nigeria
Norway
Oman [1]
Pakistan
Palau
Panama
Papua New Guinea [1]
Paraguay
Peru [1]
Philippines
Poland
Portugal
Qatar [1]
Romania [1]
Rwanda
St. Lucia
St. Vincent and the Grenadines
Samoa
Saudi Arabia [1]
Senegal
Serbia and Montenegro

 

# AVIATION (Cont'd)

Seychelles
Sierra Leone
Singapore
Slovak Republic
Slovenia
South Africa [1]
Spain
Sri Lanka
Sudan
Suriname
Swaziland
Sweden
Switzerland
Syrian Arab Republic [1]
Tajikistan
Tanzania
Thailand
Togo
Tonga
Trinidad and Tobago
Tunisia [1]
Turkey
Turkmenistan
Uganda
Ukraine [1]
Union of Soviet Socialist Republics [1][11]
United Arab Emirates [1]
United Kingdom [12]
United States
Uruguay
Uzbekistan
Vanuatu
Venezuela
Vietnam, Socialist Republic of [1]
Yemen (Aden) [13]
Yemen (Sanaa) [13]
Yugoslavia [14]
Zambia
Zimbabwe

NOTES:
[1] With reservation.
[2] With statement.
[3] The Taiwan authorities have also adhered to this convention. See note under CHINA (TAIWAN) in Section 1.
[4] Applicable to Hong Kong and Macao. With declaration. See note under CHINA in Section 1.
[5] Not extended to Faroe Islands.
[6] Applicable to Greenland.
[7] See note under ETHIOPIA in Section 1.
[8] See note under GERMANY, FEDERAL REPUBLIC OF in Section 1.
[9] On October 15, 1986 the Compact of Free Association entered into force between the Government of the United States and the Government of the Republic of the Marshall Islands, effective October 21, 1986.
[10] Applicable to the Netherlands Antilles and Aruba.
[11] See note under UNION OF SOVIET SOCIALIST REPUBLICS in Section 1.
[12] Extended to all territories under the territorial sovereignty of the United Kingdom.
[13] See note under YEMEN in Section 1
[14] See note under YUGOSLAVIA in Section 1

Convention for the suppression of unlawful acts against the safety of civil aviation. (Sabo-

tage) Done at Montreal September 23, 1971; entered into force January 26, 1973.
24 UST 564; TIAS 7570.
States which are parties:
Afghanistan [1]
Albania
Algeria [1]
Angola
Antigua and Barbuda
Argentina
Armenia
Australia
Austria
Azerbaijan
Bahamas, The
Bahrain [1]
Bangladesh
Barbados
Belarus [1]
Belgium
Belize
Benin
Bhutan
Bolivia
Bosnia-Herzegovina
Botswana
Brazil [1]
Brunei
Bulgaria
Burkina Faso
Burma
Burundi
Cambodia
Cameroon [2]
Canada
Cape Verde
Central African Republic
Chad
Chile
China [1][2][3][4]
Colombia
Comoros
Congo
Congo, Democratic Republic of the
Cook Islands
Costa Rica
Cote d'Ivoire
Croatia
Cuba
Cyprus
Czech Republic
Denmark [5]
Djibouti
Dominica
Dominican Republic
Ecuador
Egypt [1]
El Salvador
Equatorial Guinea
Estonia
Ethiopia [1][6]
Fiji
Finland
France [1]
Gabon
Gambia, The
Georgia
German Democratic Republic [1][7]
Germany, Federal Republic of [1][7]
Ghana
Greece
Grenada
Guatemala [1]
Guinea
Guinea-Bissau

Guyana
Haiti
Honduras [1]
Hungary
Iceland
India [1]
Indonesia [1]
Iran
Iraq
Ireland
Israel
Italy [2]
Jamaica
Japan
Jordan
Kazakhstan
Kenya
Korea, Democratic People's Republic of [1]
Korea, Republic of
Kuwait [1]
Kyrgyz Republic
Laos
Latvia
Lebanon
Lesotho
Liberia
Libya
Liechtenstein
Lithuania
Luxembourg
Macedonia
Madagascar
Malawi [1]
Malaysia
Maldives
Mali
Malta
Marshall Islands [8]
Mauritania
Mauritius
Mexico
Micronesia
Moldova
Monaco
Mongolia [1]
Morocco [1]
Mozambique
Namibia
Nauru
Nepal
Netherlands [9]
New Zealand
Nicaragua
Niger
Nigeria
Norway
Oman [1]
Pakistan
Palau
Panama
Papua New Guinea [1]
Paraguay
Peru [1]
Philippines
Poland
Portugal
Qatar [1]
Romania [1]
Rwanda
St. Lucia
St. Vincent and the Grenadines
Samoa
Saudi Arabia [1]
Senegal
Serbia and Montenegro

 

## AVIATION (Cont'd)

Seychelles
Sierra Leone
Singapore
Slovak Republic
Slovenia
Solomon Islands
South Africa [1]
Spain
Sri Lanka
Sudan
Suriname
Swaziland
Sweden
Switzerland
Syrian Arab Republic [2]
Tajikistan
Tanzania
Thailand
Togo
Tonga
Trinidad and Tobago
Tunisia [1]
Turkey
Turkmenistan
Uganda
Ukraine
Union of Soviet Socialist Republics [1,10]
United Arab Emirates [1]
United Kingdom [11]
United States
Uruguay
Uzbekistan
Vanuatu
Venezuela [1]
Vietnam, Socialist Republic of [1]
Yemen (Aden) [1,12]
Yemen (Sanaa) [12]
Yugoslavia [13]
Zambia
Zimbabwe

NOTES:
[1] With reservation.
[2] With declaration.
[3] The Taiwan authorities have also adhered to this convention. See note under CHINA (TAIWAN) in Section 1.
[4] Applicable to Hong Kong and Macao. With declaration. See note under CHINA in Section 1.
[5] Applicable to Faroe Islands and Greenland.
[6] See note under ETHIOPIA in Section 1.
[7] See note under GERMANY, FEDERAL REPUBLIC OF in Section 1.
[8] On October 15, 1986 the Compact of Free Association entered into force between the Government of the United States and the Government of the Republic of the Marshall Islands, effective October 21, 1986.
[9] Applicable to the Netherlands Antilles and Aruba.
[10] See note under UNION OF SOVIET SOCIALIST REPUBLICS in Section 1.
[11] Extended to all territories under the territorial sovereignty of the United Kingdom.
[12] See note under YEMEN in Section 1.
[13] See note under YUGOSLAVIA in Section 1.

Protocol for the suppression of unlawful acts of violence at airports serving international civil aviation, supplementary to the convention of September 23, 1971. Done at Montreal February 24, 1988; entered into force August 6, 1989; for the United States November 18, 1994.
TIAS
States which are parties:

Albania
Algeria
Argentina
Armenia
Australia
Austria
Azerbaijan
Bahrain
Bangladesh
Barbados
Belarus
Belgium
Belize
Benin
Bhutan
Bolivia
Bosnia-Herzegovina
Botswana
Brazil
Brunei
Bulgaria
Burkina Faso
Burma
Cambodia
Cameroon
Canada
Cape Verde
Central African Republic
Chile
China [1,2]
Colombia
Cook Islands
Costa Rica
Croatia
Cuba
Cyprus
Czech Republic
Denmark
Djibouti
Dominica
Ecuador
Egypt
El Salvador
Equatorial Guinea
Estonia
Ethiopia
Fiji
Finland
France [3]
Gabon
Gambia
Georgia
Germany
Ghana
Greece
Grenada
Guatemala
Guinea
Guyana
Honduras
Hungary
Iceland
India
Iran
Iraq
Ireland

Israel
Italy
Jamaica
Japan
Jordan
Kazakhstan
Kenya
Korea
Korea, Democratic People's Republic of
Kuwait [2]
Kyrgyz Republic
Laos
Latvia
Lebanon
Liberia
Libya
Liechtenstein
Lithuania
Luxembourg
Macedonia
Madagascar
Maldives
Mali
Malta
Marshall Islands
Mauritania
Mauritius
Mexico
Micronesia
Moldova
Monaco
Mongolia
Morocco
Mozambique
Namibia
Nauru
Netherlands [3]
New Zealand
Nicaragua
Nigeria
Norway
Oman
Pakistan
Palau
Panama
Papua New Guinea
Paraguay
Peru
Philippines
Poland
Portugal
Romania
Russian Federation
Rwanda
St. Lucia
St. Vincent and the Grenadines
Samoa
Saudi Arabia
Senegal
Serbia and Montenegro
Seychelles
Singapore
Slovak Republic
Slovenia
South Africa
Spain
Sri Lanka
Sudan
Suriname
Sweden
Switzerland
Syrian Arab Republic [2]
Tajikistan
Tanzania
Thailand



## AVIATION (Cont'd)

Togo
Tonga
Trinidad and Tobago
Tunisia
Turkey
Turkmenistan
Uganda
Ukraine
United Arab Emirates
United Kingdom [2 4]
United States
Uruguay
Uzbekistan
Vanuatu
Vietnam
Yugoslavia [5]

NOTES:
[1] Applicable to Hong Kong and Macao. See note under CHINA in Section 1.
[2] With reservation(s).
[3] With declaration(s).
[4] Applicable to Isle of Man.
[5] See note under YUGOSLAVIA in Section 1.

Convention on the marking of plastic explosives for the purpose of detection, with technical annex. Done at Montreal March 1, 1991; entered into force June 21, 1998.
TIAS
Parties:
Afghanistan [1]
Albania
Algeria [1 3]
Argentina [3]
Armenia
Austria [3]
Azerbaijan [1]
Bahrain [1]
Bangladesh
Barbados [1]
Belarus [1]
Benin
Bhutan
Bolivia [1]
Bosnia-Herzegovina
Botswana [1]
Brazil [2 3]
Bulgaria [1]
Burkina Faso
Burma
Cameroon [1]
Canada [1]
Cape Verde [1]
Chile [1]
Costa Rica
Croatia
Cuba [1 3]
Cyprus [1]
Czech Republic [1]
Denmark [1 4]
Djibouti
Ecuador [1]
Egypt [1]
El Salvador [1]
Eritrea [1]
Estonia [1]
Finland [1]
France [1]
Gambia, The [1]
Georgia [1]

Germany [3]
Ghana [1]
Greece [3]
Grenada [1]
Guatemala [1]
Guinea
Honduras [1]
Hong Kong [5]
Hungary [1]
Iceland [1]
India [2 3]
Ireland [1]
Italy [1]
Jamaica
Japan [3]
Jordan [1]
Kazakhstan [1]
Kenya [1]
Korea [2 3]
Kuwait [1]
Kyrgyz Republic [1]
Latvia [1]
Lebanon [1]
Libya [1]
Liechtenstein [1]
Lithuania [1]
Macedonia [1]
Madagascar [1]
Maldives [1]
Mali [1]
Malta [1]
Marshall Islands [1]
Mexico [1]
Moldova [1]
Monaco [1]
Mongolia [1]
Morocco [1]
Netherlands [1 6]
New Zealand [1 7]
Nigeria [1]
Norway [3]
Oman [1]
Palau [1]
Panama [1]
Paraguay
Peru [1 2]
Philippines [1]
Portugal [1]
Qatar [1]
Romania [1]
St. Kitts and Nevis [1]
Samoa [1]
Saudi Arabia [1 2]
Senegal
Seychelles [1]
Singapore [1]
Slovak Republic [1]
Slovenia [1]
South Africa [3]
Spain [3]
Sri Lanka [1]
Sudan [1]
Suriname [1]
Swaziland [1]
Switzerland [3]
Syria
Tanzania [1]
Togo [1]
Tonga [1]
Trinidad and Tobago [1]
Tunisia [1]
Turkey [1 2]
Turkmenistan
Uganda
Ukraine [1]

United Arab Emirates [1]
United Kingdom [3 8]
United States [3]
Uruguay [1]
Uzbekistan [1]
Zambia [1]

NOTES:
[1] With declaration Party is not a producer state.
[2] With reservation(s).
[3] With declaration Party is a producer state.
[4] Not applicable to the Faroe Islands.
[5] CHINA is not a party to this treaty but has made it applicable to Hong Kong.
[6] Applicable to Aruba.
[7] Not applicable to Tokelau.
[8] Extended to the Bailiwick of Guernsey, the Bailiwick of Jersey, the Isle of Man, the Cayman Islands, the Falkland Islands, Montserrat and the British Virgin Islands.

Agreement to ban smoking on international passenger flights. Done at Chicago November 1, 1994; entered into force March 1, 1995.
TIAS 12578.
Parties:
Australia
Canada
New Zealand
United States

Arrangement on the joint financing of a North Atlantic Height Monitoring System. Signed at Montreal July 31, August 11, 18 and 23, September 28, October 25 and December 12, 1995; entered into force December 12, 1995.
TIAS
Parties:
Canada
International Civil Aviation Organization
Iceland
Ireland
Portugal
United Kingdom
United States

Convention for the unification of certain rules for international carriage by air. Done at Montreal May 28, 1999; entered into force November 4, 2003.
TIAS
Parties:
Albania
Austria
Bahrain
Barbados
Belgium
Belize
Benin
Botswana
Bulgaria
Cameroon
Canada [1]
Cape Verde
China
Colombia
Cuba
Cyprus
Czech Republic
Denmark
Egypt
Estonia
European Community
Finland




## AVIATION (Cont'd)

France
Gambia
Germany
Greece [1]
Hungary
Iceland
Ireland
Italy
Japan [1]
Jordan
Kenya
Kuwait
Latvia
Lebanon
Lithuania
Luxembourg
Macedonia
Malta
Mexico

Monaco
Mongolia
Namibia
Netherlands
New Zealand [2]
Nigeria
Norway
Panama
Paraguay
Peru
Portugal [1]
Qatar
Romania
St. Vincent and the Grenadines
Saudi Arabia
Slovak Republic
Slovenia
Spain
Sweden
Switzerland
Syria
Tanzania
Tonga

United Arab Emirates
United Kingdom
United States [1]
Vanuatu

NOTES:
[1] With declaration(s).
[2] Applicable to Tokelau.

Multilateral agreement on the liberalization of
international air transportation, with annex and
appendix. Done at Washington May 1, 2001,
entered into force December 21, 2001.
TIAS
Parties:
Brunei
Chile
New Zealand
Samoa
Singapore
Tonga
United States

# EXHIBIT "C"

1  Henry H. Rossbacher, Esq. (060260)
   James S. Cahill, Esq. (070353)
2  Talin Khachaturian Tenley, Esq. (217572)
   THE ROSSBACHER FIRM
3  811 Wilshire Blvd., Suite 1650
   Los Angeles, California 90017-2666
4  Telephone: (213) 895-6500
   Facsimile: (213) 895-6161
5
   Attorneys for Plaintiff
6

**FILED**
LOS ANGELES SUPERIOR COURT

SEP 2 8 2007

JOHN A. CLARKE, CLERK

BY D.M. SWAIN, DEPUTY

7        SUPERIOR COURT OF THE STATE OF CALIFORNIA

8

9          FOR THE COUNTY OF LOS ANGELES

10                                          BC378233

11  MARIA SANCHEZ, individually and on        )  Case No.:
    behalf of all others similarly situated,  )
12                                            )  **CLASS ACTION**
                                              )
13                    Plaintiffs,             )  **CLASS ACTION COMPLAINT FOR:**
                                              )   1.  **BREACH OF WRITTEN**
14        v.                                  )       **CONTRACTS;**
                                              )   2.  **BREACH OF IMPLIED**
15  ALASKA AIRLINES, INC., and DOES 1         )       **CONVENANT OF GOOD FAITH**
    through 100, inclusive,                   )       **AND FAIR DEALING;**
16                                            )   3.  **UNJUST ENRICHMENT; AND**
                                              )   4.  **MONEY HAD AND RECEIVED**
17                    Defendants,             )
                                              )
18                                            )  **DEMAND FOR JURY TRIAL**

19

20

21

22

23

24

25

26

27

28

5.    Venue as to Defendant Airline is proper in this court pursuant to Code Civ. Proc. §§ 395(a) and 395.5.

6.    Federal subject matter jurisdiction does not exist for the claims for relief asserted in this complaint. There is no federal question jurisdiction here. The claims asserted herein only allege violations of California law. There is no diversity jurisdiction here because the $75,000 amount in controversy threshold is not satisfied. The amount in controversy as to Plaintiff and each member of the Class does not exceed $75,000. Plaintiff is informed and believes that the aggregate amount in controversy for Plaintiff and the Class totals less than $5,000,000.00, exclusive of interest and costs.

## PARTIES

### A.    PLAINTIFF

7.    In approximately December 2006, Plaintiff Maria Sanchez, an individual, ("Plaintiff") purchased in California an airline e-ticket from Defendant for travel on Defendant Airline, flight No. 282 on approximately December 6, 2006 from Los Angeles, California to Guadalajara, Mexico. As part of the purchase price for said airline ticket Plaintiff was charged by and paid approximately $215.00 to Defendant which Plaintiff is informed and believes included the amount equal to the Mexican tourism tax in the approximate sum of $22.00 (an amount that fluctuates with the dollar-peso exchange rates). Plaintiff was never notified that she was exempt from paying the Mexican tourism tax nor informed that she could claim a recovery of the amount improperly collected by Defendant Airline.

8.    At all times material to this complaint, Plaintiff was and is a citizen of Mexico. As a citizen of Mexico, Plaintiff is exempt from paying the Mexican tourism tax when she travels to Mexico.

///

6302.001/SANCHEZCOMPLAINT.ALASKA

3

**CLASS ACTION COMPLAINT**

 

**B.    DEFENDANTS**

9.    Defendant Alaska Airlines, Inc. (hereinafter "Defendant" or "Defendant Airlines") is, and at all times material to this complaint, was, a corporation organized and existing under the laws of Alaska and conducting business in California, with its principal place of business in Los Angeles, California.

10.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 100 inclusive, and therefore sues these Defendants by these fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by these Defendants.

11.    Plaintiff is informed and believes that at all times material to this complaint, Defendant Airline and each of the Defendants fictitiously named in this complaint in addition to acting for himself, herself, or itself and on his, her, or its own behalf individually, is and was acting as the agent, servant, employee and representative of, and with the knowledge, consent and permission of, and in conspiracy with, and/or aided and abetted each and all of the Defendants and within the course, scope and authority of that agency, service, employment, representation, and conspiracy. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the actions, failures to act, breaches, conspiracy, aiding and abetting alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and done with the cooperation and knowledge of each and all of the Defendants.

///

**CLASS ACTION COMPLAINT**



1   Plaintiff, Maria Sanchez, individually and on behalf of all others similarly situated, upon

2   knowledge as to herself and her own acts, and upon information and belief as to all other matters,

3   alleges as follows:

4                              NATURE OF THE ACTION

5       1.      Defendant Alaska Airlines, Inc. (hereinafter "Defendant" or "Defendant Airline")

6   collects a tourism tax imposed by the Mexican government from all passengers traveling on

7   Defendant Airline on international flights between California and Mexico.  Defendant Airline, in

8   turn, is supposed to remit the tourism tax receipts to the Mexican government.  The Mexican

9   tourism tax is collected by Defendant Airline from its airline passengers as part of the price of

10  each passenger's airline ticket purchased from Defendant in California.  However, passengers who

11  are residents (holding FM-2 or FM-3 Visas) or citizens of Mexico, as well as diplomats, children

12  under two years of age and persons staying in Mexico less than 24 hours are exempt from paying

13  the Mexican tourism tax.

14      2.      In breach of their passengers' written contracts for air travel, Defendant Airline has

15  been unjustly enriched by improperly collecting from those passengers who are exempt from the

16  Mexican tourism tax the amount of money equal to that tax.

17      3.      This class action seeks to restore to Plaintiff and the Class members the amount of

18  the Mexican tourism tax improperly collected by Defendant Airline including, without limitation,

19  relief in the form of damages and restitution, as requested in each cause of action.

20                          JURISDICTION AND VENUE

21      4.      This court has subject matter jurisdiction over this class action.  This court has

22  personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this court, and

23  at all times material to this complaint Defendant Airline systematically and continually conducted

24  business within Los Angeles County, California.

2



## CLASS ACTION ALLEGATIONS

12.    This action is brought as a class action pursuant to Code Civ. Proc. § 382 on behalf of the following Class:

> All persons who purchased airline tickets in California from Defendant Airline for travel on Defendant Airline on international flights between California and Mexico and who paid Defendant as part of the price for his or her airline ticket the Mexican tourism tax but who were exempt from paying that tourism tax (the "Class"). Persons exempt from paying Mexican tourism tax include residents (holding FM-2 or FM-3 Visas) or citizens of Mexico, diplomats, children under two years of age and persons not remaining in Mexico for more than 24 hours. Excluded from the Class are (a) Defendant Airline; (b) employees of Defendant including its officers and directors; and (c) Defendant's parents, subsidiaries and affiliates.

13.    Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendant Airline. However, Plaintiff is informed and believes that due to the nature of the trade and commerce involved, Class members are sufficiently numerous, and geographically dispersed throughout California, and that joinder of all Class members is impracticable. The information as to the identity of the Class members can be readily determined from records maintained by the Defendant and its agents.

14.    Plaintiff's claims are typical of, and not antagonistic to, the claims of the other Class members in that the claims of all members of the Class, result from the Defendant's collecting Mexican tourism tax from persons exempt from paying that. Plaintiff will advance the claims of all members of the Class who were injured by the same improper conduct of Defendant and the relief sought is common to the Class as alleged in this complaint.

15.    The common legal and factual questions which do not vary from Class member to Class member and which may be determined without reference to individual circumstances of any Class member include, but are not limited to, the following:

a.    Whether Defendant Airline collected the Mexican tourism tax from Plaintiff

6202.001/SANCHEZ COMPLAINT.ALASKA

CLASS ACTION COMPLAINT

1    and others Class members who do not owe that tax on their air trips to

2    Mexico;

3        b.    Whether Defendant Airline advised Plaintiff and other Class members that

4    they were exempt from paying the Mexican tourism tax on their air trips to

5    Mexico or otherwise made arrangements to allow for their recovery of the

6    Mexican tourism tax collected by Defendant;

7

8        c.    Whether Defendant Airline breached its written contract(s) with Plaintiff

9    and other Class members;

10        d.    Whether Defendant Airline breached the implied covenant of good faith and

11    fair dealing;

12        e.    Whether Defendant Airline was unjustly enriched by its conduct;

13

14        f.    Whether Defendant Airline became indebted to Plaintiff and other Class

15    members for money had and received; and

16        g.    Whether Plaintiff and other Class members are entitled to monetary

17    recovery, including damages and restitution, and the proper measure, nature

18    and extent of such relief.

19    16.    These common questions and others predominate over questions, if any, that affect

20    only individual members of the Class.

21

22    17.    Plaintiff and her lawyers will fairly and adequately represent the interests of the

23    Class because Plaintiff is typical of other Class members improperly charged the Mexican tourism

24    tax by Defendant Airline.  There are no material conflicts with any other member of the Class that

25    would make class certification inappropriate.  Plaintiff has retained attorneys who are experienced

26    in the prosecution of class actions, including complex cases and consumer actions, and Plaintiff

27    intends to prosecute this action vigorously.

28

**CLASS ACTION COMPLAINT**



18.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome on the court if individual litigation of numerous cases would proceed. By contrast, the conduct of this action as a class action, with respect to some or all of the issues alleged in this complaint, presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

19.    Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant Airline and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual issues.

20.    Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing Class members with a method for the redress of claims that may not otherwise warrant individual litigation.

## FACTUAL ALLEGATIONS

21.    Defendant Airline is, and at all times material to this complaint was, engaged in the business of common carrier by air of passengers for transport between California and Mexico.

22.    At all times mentioned herein, when passengers purchase their tickets in California for air travel on Defendant Airline between California and Mexico, Defendant routinely collects from its passengers the Mexican tourism tax which is included in the price of each passenger's airline ticket. The amount equal to the Mexican tourism tax cannot be determined from the information provided by Defendant. Defendant Airline is an authorized agent of the Mexican

7

CLASS ACTION COMPLAINT



1  government to collect the tourism tax from its airline passengers on international flights between

2  California and Mexico and is obligated to remit the tax to the Mexican government. Defendant

3  collects approximately $22.00 from each passenger per flight who travels between Mexico and

4  California on Defendant Airline for this tourism tax. (The amount of the tax collected by

5  Defendant Airline fluctuates, depending on the dollar-peso exchange rate.)

6

7          23.    Under Mexican law airline passengers traveling to Mexico who are residents

8  (holding FM-2 or FM-3 Visas) or citizens of Mexico as well as diplomats children under two

9  years of age and persons staying in Mexico less than 24 hours are exempt from paying the

10  Mexican tourism tax.

11          24.    After passengers have purchased their tickets from Defendant Airline and when

12  passengers check in before their flights depart from California to Mexico, Defendant Airline could

13  identify the exempt passengers and could return to them the amount of the improperly collected

14  Mexican tourism tax, or make other arrangements for a return of the improperly collected amount,

15  including but not limited to notifying the exempt passengers of their entitlement to a return.

16  However, despite its opportunity to do so, Defendant Airline failed to disclose to exempt

17  passengers (including Plaintiff and other Class members) that they are entitled to a return of the

18  improperly paid Mexican tourism tax and return the amount improperly collected by Defendant

19  Airline.

20

21          25.    Plaintiff is informed and believes that Defendant Airline does not remit to the

22  Mexican government the amounts of the tourism tax paid by exempt passengers. Defendant

23  Airline does not return the tourism tax improperly collected from its exempt passengers, nor

24  provide an opportunity for them to claim a return of the improperly paid amount.

25

26              **ESTOPPEL FROM PLEADING AND TOLLING OF**
                **APPLICABLE STATUTES OF LIMITATIONS**

27          26.    Defendants are estopped from relying on any statutes of limitations. At all times

28

8



1   material to this complaint, Defendant Airline failed to disclose to Plaintiff and other Class

2   members that the Mexican tourism tax was not due from them as exempt passengers, and that as

3   exempt passengers they were entitled to a return of the amount they paid for that tax. Plaintiff and

4   the members of the Class could not reasonably have discovered Defendants' wrongdoing. Given

5   Defendants' failure to disclose this information about their exempt status to its passengers from

6   paying the Mexican tourism tax for their air travel between California and Mexico, Defendants are

7   estopped from relying on any statutes of limitations that might otherwise be applicable to the

8   claims asserted herein.

9

10                            **FIRST CAUSE OF ACTION**

11               **(Breach Of Written Contracts Against All Defendants)**

12          27.    Plaintiff incorporates and realleges by this reference the allegations contained in

13   paragraphs 1 through 26, inclusive, of this complaint. Plaintiff brings this claim for herself and on

14   behalf of members of the Class.

15          28.    Within four years prior to the filing of this complaint, Defendant Airline entered

16   into written contracts in California with Plaintiff and other Class members for air travel between

17   California and Mexico and specifying the date, flight number, origin and destination plus the price

18   of the airline ticket. The terms of these contracts are contained in the respective airline tickets and

19   "international contract of carriage" on Defendant Airline's website at

20   www.alaskaair.com/as/www2/company/tariff/international/tariff_intl_toc.asp. In particular,

21   Defendant's contracts with Plaintiff and the Class members state, in part, as follows: "Any tax or

22   other charge imposed by government authority and collectable from a passenger will be in

23   addition to the published fares and charges." Plaintiff and the Class paid for the purchase of their

24   tickets to Defendant Airline by paying U.S. dollars or using frequent flyer miles.

25          29.    Along with the portion of the price for the airline ticket to be retained by Defendant

26

27

28

9



1   Airline, Defendant also collected from Plaintiff and other Class members, at the time the tickets

2   were purchased, a number of taxes for various taxing authorities, including the Mexican tourism

3   tax. At all times material to this complaint, Defendant Airline promised Plaintiff and other Class

4   members that Defendant only collects applicable taxes imposed by government authorities it is

5   required to collect from passengers who owe the taxes.

6

7        30.    Plaintiff and Class members have performed all conditions, covenants and

8   promises required on their part to be performed in accordance with the terms of said written

9   contracts, including payment to Defendant Airline of the ticket fares and amounts claimed as taxes

10  for each ticket.

11       31.    Within four years prior to the filing of this complaint, Defendant Airline breached

12  its written contracts with Plaintiff and Class members by improperly collecting from them the

13  amount of the Mexican tourism tax (approximately $22.00) for each airline ticket which was not

14  applicable to Plaintiff and Class members due to their exempt status under Mexican law.

15

16       32.    As a proximate result of Defendant Airline's breach of the written contracts,

17  Plaintiff and each Class member have been damaged in the amount improperly collected from

18  them for the Mexican tourism tax for each airline ticket in an amount according to proof, plus

19  interest thereon at the maximum legal rate until entry of judgment.

20

21                            **SECOND CAUSE OF ACTION**

22   **(Breach of Implied Covenant Of Good Faith And Fair Dealing Against All Defendants)**

23       33.    Plaintiff incorporates and realleges by this reference the allegations contained in

24  paragraphs 1 through 32, inclusive, of this complaint. Plaintiff brings this claim for herself and on

25  behalf of members of the Class. .

26       34.    The written contracts between Plaintiff and the Class on one hand, and Defendant

27  Airline include an implied covenant of good faith and fair dealing that neither party would do

28

                                          10



1   anything to injure the right of the other party to receive the benefits of the agreement.

2       35.    After the written contracts took effect, Defendant Airline failed to inform Plaintiff

3   and other Class members that the Mexican tourism tax was not due from them as exempt

4   passengers, and that, as exempt passengers they were entitled to a return of the amount they

5   improperly paid for that tax. Defendant Airline was in a superior position to know the true facts

6   about the Mexican tourism tax and was duty-bound to make such disclosures to Plaintiff and other

7   Class members. Defendant's failure to make such disclosures after the written contracts took

8   effect has unfairly prevented Plaintiff and Class members from receiving the benefits of their

9   contracts. In acting in this manner, Defendant Airline violated the implied covenant of good faith

10  and fair dealing that exists in the contracts between Plaintiff and other Class members and

11  Defendant Airline.

12

13      36.    As a proximate result of Defendant Airline's breach of its implied covenant of good

14  faith and fair dealing, Plaintiff and each Class member have been damaged in the amount

15  improperly retained by Defendant Airline for the Mexican tourism tax for each airline ticket in an

16  amount according to proof, plus interest there on at the maximum legal rate until entry of

17  judgment.

18

19                          **THIRD CAUSE OF ACTION**

20                      **(Unjust Enrichment Against All Defendants)**

21

22      37.    Plaintiff incorporates and realleges by this reference the allegations contained in

23  paragraphs 1 through 36, inclusive, of this complaint. Plaintiff brings this claim for herself and on

24  behalf of members of the Class.

25      38.    Defendant Airline has been unjustly enriched because it knowingly gained and

26  retained money in an inequitable manner at the expense of its passengers and is thus accountable

27  to the Plaintiff and the members of the Class to restore such money. The Defendant may not

28

11

CLASS ACTION COMPLAINT



1  retain the benefits from its improper conduct and those benefits belong instead to Plaintiff and

2  members of the Class. Defendant Airline must make restitution of all amounts so improperly and

3  unjustly obtained according to proof, plus interest at the maximum legal rate until entry of

4  judgment.

### FOURTH CAUSE OF ACTION

#### (Money Had And Received Against All Defendants)

8  39.    Plaintiff incorporates and realleges by this reference the allegations contained in

9  paragraph 1 through 38, inclusive, of this complaint. Plaintiff brings this claim for herself and on

10  behalf of members of the Class.

11  40.    Within four years prior to the filing of this complaint, Defendant Airline became

12  indebted to Plaintiff and other Class members for money had and received by Defendant Airline

13  for the use and benefit of Plaintiff and other Class members in an amount according to proof.

14

15  41.    No payment has been made by Defendant Airline to Plaintiff and the other Class

16  members, and there is now owing to Plaintiff and Class members the amount improperly retained

17  by Defendant Airline for the Mexican tourism tax for each airline ticket in an amount according to

18  proof, plus interest thereon at the maximum legal rate until entry of judgment.

### PRAYER FOR RELIEF

20  WHEREFORE, on behalf of herself and the Class, Plaintiff prays for judgment against

22  Defendants as follows:

23  1.    For certification of the proposed Class appointing Plaintiff and her counsel to

24  represent the Class, and notice to the Class to be paid by Defendants;

25  2.    For compensatory damages suffered by Plaintiff and Class members in an amount

26  according to proof on the First, Second and Fourth Causes of Action;

27  3.    For restitution to Plaintiff and Class members in addition to other unjust

28

12




1  enrichment of Defendants in an amount according to proof on the Third Cause of Action;

2       4.    For an award of attorney's fees pursuant to Code Civ. Proc. §1021.5, or any other

3  provision of law;

5       5.    For prejudgment interest;

6       6.    For costs of suit; and,

7       7.    For such other and further relief as the court may declare just and proper.

8  Dated: September 27, 2007                    Respectfully submitted,

9                                              THE ROSSBACHER FIRM

12                                        By: _____
                                              Henry H. Rossbacher

14                                            Attorney for Plaintiff

15  6202.001/hw:SANCHEZCOMPLAINT.ALASKA

## DEMAND FOR JURY TRIAL

Plaintiff on behalf of herself and all others similarly situated hereby request a jury trial on the claims so triable.

Dated:  September 27, 2007

Respectfully submitted,

**THE ROSSBACHER FIRM**

By: _____
Henry H. Rossbacher

Attorney for Plaintiff

6202.001/SANCHEZ COMPLAINT.ALASKA

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................2

II. STATEMENT OF ISSUES TO BE DECIDED .........................................................3

III. STATEMENT OF FACTS ...................................................................................3

    A.    Plaintiff's Complaint And Removal.................................................................3

    B.    The Mexican Tourism Tax ............................................................................4

    C.    Alaska's Procedures for Collecting the Mexican Tourism Tax .......................4

    D.    Plaintiff's Asserted Claims And Requested Relief .........................................6

    E.    Prior Actions Involving the Mexican Tourism Tax ........................................6

IV. ARGUMENT .................................................................................................7

    A.    The Legal Standard.......................................................................................7

    B.    The Montreal Convention Preempts And Prohibits Plaintiff's State
        Law Claims...................................................................................................8

        1.    Federal Preemption.............................................................................8

        2.    The Montreal Convention ...................................................................8

        3.    The Montreal Convention Preempts State Law Claims........................9

        4.    Plaintiff's Claims are Subject to the MONTREAL CONVENTION .......12

    C.    The Airline Deregulation Act ALSO Preempts and Prohibits the
        Plaintiff's State Law Claims........................................................................16

    D.    Plaintiff's Claims For Relief Otherwise Fails To State A Claim For
        Which Relief Can Be Granted......................................................................22

        1.    The COMPLAINT Does Not State a Claim for Breach of
            Contract ...........................................................................................22

        2.    The COMPLAINT Fails to State a Claim for "Money Had and
            Received" .........................................................................................23

V. CONCLUSION AND REQUESTED RELIEF ........................................................24

# <u>TABLE OF AUTHORITIES</u>

<u>Federal Cases</u>

*American Airlines, Inc. v. Wolens*,
   513 U.S. 219, 115 S. Ct. 817 (1995) ................................................................ 17, 21, 22

*Balistreri v. Pacifica Police Department*,
   901 F.2d 696 (9th Cir. 1988) ...................................................................................... 7

*Boehringer-Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc.*,
   737 F.2d 456 (5th Cir. 1984) ...................................................................................... 9

*Buck v. American Airlines, Inc.*,
   476 F.3d 29 (1st Cir. 2007) .......................................................................... 19, 20, 22

*Charas v. Trans World Airlines, Inc.*,
   160 F.3d 1259 (9th Cir. 1998) ................................................................................. 16

*Clegg v. Cult Awareness Network*,
   18 F.3d 752 (9th Cir. 1994) ....................................................................................... 7

*Donkor v. British Airways*,
   62 F. Supp. 2d 963 (E.D.N.Y. 1999) ...................................................................... 10

*El Al Israeli Airlines, Ltd. v. Tsui Yuan Tseng*,
   525 U.S. 155 (1999) ................................................................................................. 10

*Hingson v. Pacific Southwest Airlines*,
   743 F.2d 1408 (9th Cir. 1984) ................................................................................. 17

*Husmann v. TWA*,
   169 F.3d 1151 (8th Cir. 1999) ................................................................................. 10

*Knowlton v. American Airlines*,
   2007 WL. 273794 (D. Md. January 31, 2007) ............................................. 10, 11, 13

*Lehman v. USAir Group, Inc.*,
   930 F. Supp. 912 (S.D.N.Y. 1996) .......................................................................... 21

*Maryland v. Louisiana*,
   451 U.S. 725 (1981) ................................................................................................... 8

*Mbaba v. Societe Air France*,
   457 F.3d 496 (5th Cir. 2006) .............................................................................. 14, 15

*In re Mexico City Aircrash*,
   708 F.2d 400 (9th Cir. 1983) ................................................................................... 10

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ..................................................................................... 16, 17, 21

*Potter v. Delta Air Lines*,
   98 F.3d 881 (5th Cir. 1996) ....................................................................................... 9

*Rowe v. N.H. Motor Transport Association,*
  522 U.S. __, 128 S. Ct. 989 (2008) ....................................................................17

*Singh v. North American Airlines,*
  426 F. Supp. 2d 38 (E.D.N.Y. 2006) ...................................................................9

*Sobol v. Continental Airlines,*
  2006 WL 2742051 (S.D.N.Y. Sept. 26. 2006) ....................................................12

*Sprewell v. Golden State Warriors,*
  266 F.3d 979 (9th Cir. 2001) ................................................................................7

*Statland v. American Airlines, Inc.,*
  998 F.2d 539 (7th Cir. 1993) ..............................................................................20

*Taj Mahal Travel, Inc. v. Delta Airlines, Inc.,*
  164 F.3d 186 (3rd Cir. 1998) ..............................................................................16

State Cases

*Acoustics, Inc. v. Trepte Construction Co.,*
  14 Cal. App. 3d 887 (1971) ................................................................................23

*Schultz v. Harney,*
  27 Cal. App. 4th 1611 (1994) .............................................................................23


Federal Statutes

28 U.S.C. § 1367 ........................................................................................................22

29 U.S.C. § 1144(a) ...................................................................................................17

49 U.S.C. § 14501(c)(1) ............................................................................................17

49 U.S.C. § 40101(a)(6),(A)(9) .................................................................................16

49 U.S.C. § 40105 .......................................................................................................8

49 U.S.C. § 41713(b) ................................................................................1, 2, 16, 17, 19

Federal Rule of Civil Procedure 12(b)(6) ..............................................................1, 7

1

**NOTICE OF MOTION AND MOTION**

2     PLEASE TAKE NOTICE that on September 9, 2008, at 9:00 a.m., or as soon

3 thereafter as counsel may be heard, in Courtroom E of the above-entitled court located at

4 450 Golden Gate Avenue, 15th Floor, San Francisco, California, the Honorable Magistrate

5 Judge Elizabeth LaPorte presiding, defendant Alaska Airlines, Inc. ("Alaska") will bring

6 on for hearing a motion for an order pursuant to Federal Rule of Civil Procedure 12(b)(6)

7 dismissing each of the claims for relief in plaintiff Don Nelson ("Plaintiff" or "Nelson")

8 for failure to state a claim upon which relief can be granted.

9     This motion is made on the grounds that Plaintiff's claims for relief are preempted

10 by the Airline Deregulation Act (currently codified at 49 U.S.C. § 41713(b), and even if

11 they were not, Plaintiff has failed to allege adequate facts to state a claim upon which relief

12 can be granted against Alaska.

13     This motion is based on this Notice of Motion, Memorandum of Points and

14 Authorities, Declarations of Kevin Thiel, Steve Jarvis, Jeff Butler, and Philip F. Atkins-

15 Pattenson, all other pleadings and papers on file or deemed to be on file, and any argument

16 that may be presented to the Court in connection with this motion.

17 ///

18 ///

19 ////

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff Kenneth Don Nelson ("Plaintiff" or "Nelson") alleges that he was damaged by improperly having to pay a $22 tax in connection with his transportation onboard aircraft operated by defendant Alaska Airlines, Inc. ("Defendant" or "Alaska") between San Francisco and San Jose del Cabo, Mexico, on several occasions "[d]uring, at least, the last four years." (*See* COMPLAINT ¶¶ 7-8.) Although Plaintiff acknowledges that the Mexican government imposes the $22 tax on certain airline passengers traveling into Mexico (the "Mexican Tourism Tax"), Plaintiff claims that when he traveled onboard the Alaska flights he was "exempt" from the Mexican Tourism Tax because he possessed a "Mexican FM2 or FM3 Visa." (*Id.*) The COMPLAINT lists two claims for relief: (1) "breach of written contracts"; and (2) "money had and received." The COMPLAINT broadly asserts that Alaska has breached "written contracts" by its purported collection of the Mexican Tourism Tax from exempt passengers (¶¶ 26-30), but does not identify, much less attach, any such written contract.[1]

Because the damage experienced by Plaintiff, if any, occurred "on board the aircraft or in the course of any of the operations of embarking or disembarking" flights, both of Plaintiff's claims for relief are preempted and prohibited by Articles 17(1) and 29 of the "Convention for the Unification of Certain Rules for International Carriage by Air" (the "MONTREAL CONVENTION").[2] The claims are also preempted by the AIRLINE DEREGULATION ACT (currently codified at 49 U.S.C. § 41713(b) ("ADA")), because they "related to" a "price, route or service" of an airline. In addition, Plaintiff's COMPLAINT fails to allege sufficient facts to state a claim for relief against Alaska. Thus, for the

---

[1]    The COMPLAINT's reference to Alaska's website does not include any contractual undertaking by Alaska relating to the Mexican Tourism Tax.

[2]    A copy of the MONTREAL CONVENTION is attached as Exhibit A hereto.

1  reasons more fully explained below, Alaska respectfully requests that its motion be granted

2  and this matter be dismissed with prejudice.

### II.

### STATEMENT OF ISSUES TO BE DECIDED

Pursuant to Local rule 7-4, Alaska submits that the issues to be decided on this

motion are:

1.    Whether Plaintiff's claims for relief are preempted by the Montreal

Convention and/or the ADA.

2.    Whether, even if not preempted by the Montreal Convention and/or the

ADA, Plaintiff's claims for relief nevertheless should be dismissed for failure to state a

claim upon which relief can be granted.

### III.

### STATEMENT OF FACTS

### A.    Plaintiff's Complaint And Removal

On June 13, 2008, Plaintiff, on behalf of himself and "all others similarly situated,"

filed a complaint against Alaska in the San Francisco County Superior Court.  Alaska

timely removed the case to this Court on July 24, 2008.  The COMPLAINT alleges that

Alaska is "engaged in the business of common carrier by air of passengers for transport

between California and Mexico." (COMPLAINT ¶ 21.)  It further alleges that "when

passengers purchase their tickets in California for air travel on [Alaska] between California

and Mexico, Defendant routinely collects from its passengers the Mexican tourism tax."

(*Id.* ¶ 22.)  The Plaintiff alleges that "[d]uring, at least, the last four years" he was damaged

by having to pay $22 for the Mexican Tourism Tax in connection with transportation on

board Alaska Flight Numbers 224, 225, 235 and 236, "and other flights" from San

Francisco to San Jose del Cabo, Mexico, despite being "exempt" from such Tax because of

his possession of a "Mexican FM2 or FM3 Visa."  (*See* COMPLAINT ¶¶ 7-8.)  An FM2 visa

is for a person seeking Mexican citizenship or permanent residency status in Mexico; and

an FM3 visa is a renewable long-term (more than six months) permit which gives the

1  holder non-immigrant temporary residence status.  (*See* DECLARATION OF KEVIN THIEL

2  ("THIEL DECL.") ¶ 7.)[3]  The Plaintiff seeks to represent a "class" consisting of "[a]ll

3  exempt persons who purchased airline tickets in California from Defendant." (COMPLAINT

4  ¶ 12.)

5         **B.**    **The Mexican Tourism Tax**

6         In or about July 1999, the Mexican government started to impose the

7  Mexican Tourism Tax (also known as an "immigration tax" or "visitors tax") on airline

8  passengers that fly to Mexico to visit that country.  (THIEL DECL. ¶ 4.)  This tax is also

9  referred to as "DNI" (which are the initials for "Derechos de No Immigrante") or by the

10  code "UK" assigned by the International Air Transport Association.  (*Id.*)  The tax was

11  created to compensate the Mexican government for the cost of processing non-Mexican

12  citizens and residents through the immigration control operations at Mexican airports.

13  (*Id.*)

14         **C.**    **Alaska's Procedures for Collecting the Mexican Tourism Tax**

15         The Mexican government mandates that carriers such as Alaska collect the

16  Mexican Tourism Tax from passengers flying from outside Mexico into that country.

17  (THIEL DECL. ¶ 5.)   In compliance with Mexican law, Alaska includes the Mexican

18  Tourism Tax in the price of tickets that are sold for transportation from the United States to

19  Mexico.  (*Id.*)

20         The Mexican law that requires Alaska to collect the Mexican Tourism Tax contains

21  certain exemptions, including for Mexican citizens, Mexican legal residents, holders of

22  FM-2 and FM-3 visas, infants, diplomats, on-duty airline crew members, and customers

23  that will not remain in Mexico for more than 24 hours (the "Tourism Tax Exemptions").

24  (THIEL DECL. ¶ 6.)

25

26  ---

[3]      The Declarations submitted in support of Alaska's motion to dismiss were

27      originally filed in support of its notice of removal on July 24, 2008.  For the Court's
    convenience, they are replicated here.

28

       **-4-**       ALASKA AIRLINES' MOTION TO
DISMISS

1    In order for a passenger to be entitled to a Tourism Tax Exemption, the passenger

2    must provide proof of his or her exempt status, including a passport, birth certificate, or, in

3    Plaintiff's case, his FM-2 or FM-3 visa. (THIEL DECL. ¶ 8.) However, since the vast

4    majority of passengers purchase their tickets from Alaska through the internet or over the

5    telephone, it is not possible for Alaska to determine whether a customer qualifies for a

6    Tourism Tax Exemption at the time that the ticket is purchased. (*Id.*)

7    Payment of the Mexican Tourism Tax is made to the Mexican government on a

8    quarterly basis by Alaska's office in Mexico City, Mexico. (THIEL DECL. ¶ 9.) That office

9    determines the amount that is owed to the Mexican government for the Tourism Tax by

10   reviewing the Departure Manifest (in Spanish, the "Manifesto Salida") forms that Alaska's

11   customer service agents complete and provide to the Mexican government for each aircraft

12   that departs Mexico for the United States. A sample Departure Manifest form is provided

13   as Exhibit A to the THIEL DECL. (*Id.*) The agents obtain the information as to whether a

14   particular departing passenger qualifies for a Tourism Tax Exemption by reviewing the

15   passenger's passport or other documentation which is presented when that passenger

16   checks in for the flight from Mexico to the United States. However, there is no obligation

17   for Alaska agents to determine whether a U.S. citizen possesses an FM-2 or FM-3 visa.

18   In the form provided as Exhibit A to the THIEL DECL., the entry "DNI: 85" near the

19   bottom left-hand corner indicates that 139 passengers onboard Alaska Airlines Flight 235

20   from San Jose del Cabo, Mexico to San Francisco were subject to the Mexican Tourism

21   Tax, and eight passengers were exempt from the Tax. A similar form is completed for

22   each Alaska flight that departs Mexico for the United States. (*Id.*)

23   If an Alaska Airlines passenger who qualifies for a Tourism Tax Exemption paid

24   cash for his or her ticket and requests a refund at the airport in Mexico, the Alaska staff

25   may provide a cash refund to that passenger. (THIEL DECL. ¶ 10.) However, the large

26   majority of Alaska customers use credit cards to purchase their tickets. (*Id.*) In those

27   instances where a passenger who qualifies for a Tourism Tax Exemption bought the ticket

28   with a credit card, he or she can request and receive a refund of the Mexican Tourism Tax

1  by contacting Alaska's Revenue Accounting Department and providing the necessary

2  proof of exemption.  (*Id.*)

3          If a passenger cancels his or her ticket prior to a flight and is entitled to a refund of

4  the ticket price, Alaska also will refund the Mexican Tourism Tax that was collected at the

5  time that the ticket was purchased.  (THIEL DECL. ¶ 12.)

6          **D.    Plaintiff's Asserted Claims And Requested Relief**

7          The COMPLAINT lists two claims for relief:  (1) breach of written contract; and

8  (2) "money had and received."  Although the Plaintiff asserts that Alaska has breached a

9  "written contract" and a "promise" by its purported collection of the Mexican Tourism Tax

10  from exempt passengers which it allegedly fails to remit to the Mexican government or

11  refund to the passengers (¶¶ 26-30), the COMPLAINT does not identify, much less attach,

12  any such written agreement.  The COMPLAINT seeks:  (1) certification of a class;

13  (2) compensatory damages; (3) restitution; and (4) attorneys fees, costs and prejudgment

14  interest.

15          **E.    Prior Actions Involving the Mexican Tourism Tax**

16          On September 28, 2007, Plaintiff's counsel filed a virtually-identical class action

17  complaint against Alaska in the Los Angeles County Superior Court, which also alleged

18  that Alaska was liable for allegedly collecting the Mexican Tourism Tax from exempt

19  passengers traveling from California to Mexico.  (*Sanchez v. Alaska Airlines, Inc*., Case

20  No. BC378233 (the "Sanchez Case").)[4]  Alaska timely removed the Sanchez Case to the

21  U.S. District Court of the Central District of California (Case No. CV07-7224 R (RCx)) on

22  the ground that the claims were completely preempted by the Montreal Convention.

23  Nelson's counsel did not challenge removal and voluntarily dismissed the complaint and

24  action in lieu of opposing Alaska's motion to dismiss Sanchez's First Amended Complaint

25  on the grounds, *inter alia*, that Sanchez's claims were preempted by the Montreal

26

27  [4]      A true and correct copy of the Complaint in the Sanchez Case is attached as
          Exhibit C hereto.

28

1    Convention and the Airline Deregulation Act.  Nelson's counsel also sued Mexicana

2    Airlines and Aeromexico in the Superior Court for the County of Los Angeles, and those

3    cases also were removed to the U.S. District Court for the Central District of California

4    without objection from Nelson's counsel.  (*Sanchez v. Compania Mexicana de Aviacion*

5    *S.A.*, Case No. CV 07-7196 (RCx) and *Sanchez v. Aerovias de Mexico, S.A.,* Case

6    No. 07-7280 (RCx).)  In those cases, the court dismissed all of the plaintiff's claims,

7    holding that they were preempted by the ADA.  (*See, e.g., Sanchez v. Compania Mexicana

8    de Aviacion, supra*, (C.D. Cal. March 23, 2008)).[5]   Both cases are currently on appeal to

9    the U.S. Court of Appeals for the Ninth Circuit (Cons. Case No. 08-55554).

10                                                **IV.**

11                                           **ARGUMENT**

12        A.      **The Legal Standard**

13        A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the

14    claims asserted in the complaint.  (FED. R. CIV. P. 12(b)(6).)  A complaint should be

15    dismissed under Rule 12(b)(6) as a matter of law where there is either a "lack of a

16    cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable

17    legal theory."  (*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).)

18    Although allegations of material fact must be accepted as true, "the court is not required to

19    accept legal conclusions cast in the form of factual allegations if those conclusions cannot

20    reasonably be drawn from the facts alleged."  (*Clegg v. Cult Awareness Network*, 18 F.3d

21    752, 754-55 (9th Cir. 1994); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th

22    Cir. 2001).)

23    ///

24    ///

25    ///

26    ─────────────────────

27    [5]     A true and correct copy of the Court's Findings Of Fact and Conclusions of Law are
         attached as Exhibit B to the DECLARATION OF PHILIP F. ATKINS-PATTENSON
28       ("ATKINS-PATTENSON DECL.")

B.    **The Montreal Convention Preempts And Prohibits Plaintiff's State Law Claims**

Plaintiff's claims for relief should be dismissed as preempted by the Montreal Convention.

### 1.    Federal Preemption

Federal preemption of state law is grounded in the Supremacy Clause of the U.S. Constitution, which provides that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const. art. VI, cl. 2.)  Under the Supremacy Clause, if a state law conflicts with federal law, the state law is preempted and "without effect." (*Maryland v. Louisiana,* 451 U.S. 725, 746, (1981).)

Preemption can take one of several forms.  A federal law may preempt a state law expressly.  It may also preempt a state law by implication, either (i) when the scheme of federal regulation is sufficiently comprehensive to support a reasonable inference that Congress left no room for supplementary state regulation, or (ii) if the state law actually conflicts with federal regulations.  A state law presents an actual conflict when the state law would obstruct Congress' purposes and objectives.

### 2.    The Montreal Convention

The Montreal Convention was signed on May 28, 1999, and entered into force on November 4, 2003.[6]  Both the United States and Mexico are parties to the Montreal Convention.[7]  Article 1 of the Montreal Convention, entitled "Scope of Application," declares that the "Convention applies to all international carriage of persons, baggage, or cargo performed by aircraft for reward." (Article 1(1) (Emphasis added.))  "International

---

[6]    The MONTREAL CONVENTION supersedes the much older "convention for the Unification of Certain Rules Relating to International Transportation by Air" (the "Warsaw Convention"), Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (1934), note following 49 U.S.C. § 40105. (MONTREAL CONVENTION Art. 55.)

[7]    *See* U.S. Department of State, Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2006, a true and correct copy of which is attached hereto as Exhibit B.

1  carriage" is defined to mean "any carriage in which, according to the agreement between

2  the parties, the place of departure and the place of destination . . . are situated . . . within

3  the territories of two States Parties . . . ."  (Article 1(2).)

4         Chapter III of the Montreal Convention, entitled "Liability of the Carrier and Extent

5  of Compensation for Damage," defines in Articles 17, 18 and 19 the three kinds of liability

6  for which the Convention provides the potential recovery of damages.  Article 17(1)

7  establishes the conditions of liability for personal injury to passengers:

8         The carrier is liable for damage sustained in case of death or bodily injury
       of a passenger upon condition only that the accident which caused the death
9      or injury took place on board the aircraft or in the course of any of the
       operations of embarking or disembarking.  (Emphasis added.)
10

11  Article 18 establishes the conditions of liability for damage to cargo.  Article 19 provides

12  the conditions of liability for damage caused by delay.

13  Article 29 – entitled "Basis of claims" – states:

14        In the carriage of passengers, baggage and cargo, any action for damages,
       however founded, whether under this Convention or in contract or in tort or
15     otherwise, can only be brought subject to the conditions and such limits of
       liability as are set out in this Convention without prejudice to the question
16     as to who are the persons who have the right to bring suit and what are their
       respective rights. . . .   (Emphasis added.)
17

18  Thus, under Articles 17(1) and 29, "any action for damages, however founded" wherein

19  the plaintiff alleges damages arising out of the international "carriage of passengers" –

20  whether "in contract or in tort" – may "only be brought" subject to the terms and

21  limitations of the MONTREAL CONVENTION, where, as here, the alleged damage occurred

22  "on board the [internationally bound] aircraft or in the course of any of the operations of

23  embarking [on] or disembarking [from]" the aircraft.

24              **3.      The Montreal Convention Preempts State Law Claims**

25         Several federal courts "have held that the Warsaw Convention [the predecessor to

26  the Montreal Convention] does completely preempt those claims that fall within its

27  scope." (*Singh v. North American Airlines*, 426 F. Supp. 2d 38, 45 (E.D.N.Y. 2006)

28  (citing *Potter v. Delta Air Lines,* 98 F.3d 881, 883 (5th Cir. 1996); *Boehringer-Mannheim*

1   *Diagnostics, Inc. v. Pan American World Airways, Inc.,* 737 F.2d 456, 458 (5th Cir. 1984);

2   *Husmann v. TWA,* 169 F.3d 1151, 1153 (8th Cir. 1999); *In re Mexico City Aircrash,*

3   708 F.2d 400, 415 (9th Cir. 1983); *Donkor v. British Airways*, 62 F. Supp. 2d 963, 967

4   (E.D.N.Y. 1999).)

5          In *El Al Israeli Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155 (1999), the Supreme

6   Court construed Article 24 of the Warsaw Convention (the predecessor to the MONTREAL

7   CONVENTION) that contained language nearly identical to the language in Article 29 of the

8   MONTREAL CONVENTION,[8] and held that a passenger could not pursue state law claims for

9   alleged emotional injury from an intrusive pre-boarding security search at John F.

10  Kennedy International Airport in New York.  The Court stated that "a passenger whose

11  injury is not compensable under the Convention (because it entails no 'bodily injury' or

12  was not the result of an 'accident') ***will have no recourse to an alternate remedy***."

13  (525 U.S. at 160-61) (Emphasis added).)  The Court explained that "Recourse to local law

14  . . . would undermine the uniform regulation of international air carrier liability that the

15  Warsaw Convention was designed to foster." (*Id*. at 161.)  The Court added:

16          The Convention signatories, in the treaty's preamble, specifically
                "recognized the advantage of regulating in a uniform manner the conditions
17          of . . . the liability of the carrier." 49 Stat. 3014. . . . . Given the
                Convention's comprehensive scheme of liability rules and its textual
18          emphasis on uniformity, we would be hard put to conclude that the
                delegates at Warsaw meant to subject air carriers to the distinct,
19          nonuniform liability rules of the individual signatory nations.

20  (*Id*.)

21          Additionally, the U.S. District Court for the District of Maryland last year held that

22  the Montreal Convention completely preempted a plaintiff's claim that an airline

23  improperly failed to provide her a promised breakfast on board an international flight.

24  (*Knowlton v. American Airlines*, Civil Action No. RDB-06-854, 2007 WL 273794 (D. Md.

25  January 31, 2007).)  The plaintiff in that case booked a round-trip ticket on American

26  _____
       [8]    Article 24, as amended, stated, "In the carriage of passengers and baggage, any action
27          for damages, however founded, can only be brought subject to the conditions and limits
            set out in this Convention . . . ."
28

Airlines to fly from Baltimore to the Dominican Republic, connecting through Puerto Rico on route to the Dominican Republic.  The plaintiff received an electronic confirmation of her travel itinerary from American which included the notation "breakfast" on the flight from Baltimore to Puerto Rico.  According to the plaintiff, this notation created a contractual obligation between herself and American for the airline to provide her with a complimentary breakfast.  However, the plaintiff did not receive a free breakfast; rather she was told that American no longer provided complimentary meals and that she could purchase breakfast for three dollars.

The plaintiff filed a purported class action complaint against American in Maryland state court, on behalf of herself and others similarly situated, alleging breach of contract.  The airline asserted that "even though the Montreal Convention did not specifically discuss carrier liability for the alleged breach of contract at issue in [the] case, the treaty nonetheless completely preempt[ed] Plaintiff's claim."  (*Id.*)  The court agreed with American, holding:

> The Montreal Convention imposes three categories of strict liability on air carriers.  Article 17 provides for carrier liability in the event of accidental death or bodily injury of a passenger while on board, embarking or disembarking the plane.  Montreal Convention at art. 17.  Article 17 also includes liability for damage to or loss of baggage.  *Id.*  Article 18 of the Montreal Convention addresses liability for damage to cargo, and Article 19 imposes liability for damages resulting from delay of passengers, baggage, or cargo.  *Id.* at arts. 18-19.  ***These categories are meant to be exclusive and encompass the scope of international airline liability.  Article 29 of the treaty contains an express statement of exclusivity: "any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention."***

(*Id.* at *2) (Emphasis added).)

The court further held that the Warsaw and Montreal Conventions "were designed to create a uniform system of liability among airlines for claims arising from international flights," and that "[a]s a matter of public policy, airlines should not be subject to contract claims in state courts involving a three-dollar breakfast."  (*Id.* at *5.)

///

///

### 4.    Plaintiff's Claims are Subject to the MONTREAL CONVENTION

Plaintiff's allegation that he was damaged as a result of having to pay the Mexican Tourism Tax – despite being exempt from the Tax as the holder of a FM-2 or FM-3 visa – clearly falls within the ambit of the Montreal Convention.  As set forth above, the "Convention applies to all international carriage of persons, baggage, or cargo performed by aircraft for reward."  (Article 1(1).)  Plaintiff's alleged payment of the $22 Mexican Tourism Tax was, without question, in connection with the "international carriage" of his person "by aircraft for reward."

Moreover, it is clear that the damage allegedly suffered by the Plaintiff, if any, occurred "on board the aircraft or in the course of any of the operations of embarking or disembarking" (Article 17(1)), and is therefore subject to the language in Article 29 that "*in the carriage of passengers . . . any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention* . . . ." (Emphasis added.)  *The primary injury to the Plaintiff occurred, if at all, while he was on board the Alaska flights*.  It was during the flights that the Plaintiff was allegedly being charged for international air transportation at a rate that was $22 higher than he purportedly should have been charged.

The Plaintiff's situation is similar to that of a passenger who paid for a first class ticket but was required to be seated in the economy section of the flight.  Any resulting injury would have occurred during the flight because that was when the passenger was required to sit in the economy section despite having paid for a first class ticket.  (*See Sobol v. Continental Airlines*, 2006 WL 2742051, *1, 5 (S.D.N.Y. Sept. 26. 2006) (Montreal Convention (and its predecessor, the Warsaw Convention) preempted and barred claim against airline for "downgrading of a first class ticket to coach on an international flight from Newark, New Jersey to Mazatlan, Mexico, and the later downgrading of two first class tickets").  Similarly, Plaintiff here is complaining because

1    he was charged more for his transportation **on board** the Alaska flights than he claims he

2    should have paid.

3    Notably, if the Plaintiff had decided not to board the Alaska flights and was eligible

4    for a refund of his ticket, he also would have been refunded the $22 Mexican Tourism Tax

5    (assuming he had paid it). (THIEL DECL. ¶ 11 ("If a passenger cancels his or her ticket

6    prior to a flight and is entitled to a refund of the ticket price, Alaska also refunds the

7    Mexican Tourism Tax that was collected at the time that the ticket was purchased").)

8    Thus, Plaintiff's damage, if any, occurred by reason of the fact that he took the Alaska

9    flights and he was injured because he allegedly paid more for the flights than was

10   necessary.

11   Plaintiff's situation also shares much in common with the litigant-passenger in

12   *Knowlton v. American Airlines*, *supra*, 2007 WL 273794, who claimed that she was

13   injured because she did not receive a breakfast during the flight in question which had

14   been promised to her when she booked her ticket. In *Knowlton,* the court determined that

15   the MONTREAL CONVENTION completely preempted the plaintiff's state law claims

16   because, *inter alia,* "[a]s a matter of public policy, airlines should not be subject to contract

17   claims in state courts involving a three-dollar breakfast." (*Id.* at *5.) Here, the Plaintiff is

18   complaining of injury which he experienced during his international flight (namely, having

19   to allegedly pay $22 more for air transportation than he believed was required). As in

20   *Knowlton*, airlines engaged in international transportation should not be subject to contract

21   claims in state courts involving a $22 foreign tax.

22   Plaintiff conceivably may argue that his injury would have occurred when he

23   purchased his ticket for air transportation from California to Mexico. This argument fails

24   if for no other reason than that Alaska was not then in any position to determine whether or

25   not the Plaintiff was exempt from the Mexican Tourism Tax at that time. (THIEL DECL.

26   ¶ 8.) In order for a passenger to be entitled to a Tourism Tax Exemption, the passenger

27   must provide proof of his or her exempt status, including a passport, birth certificate, or, in

28   Plaintiff's case, his FM-2 or FM-3 visa. (*Id.*) Since the vast majority of passengers

1  purchase their tickets for Alaska through the internet or over the telephone, it is not

2  feasible for Alaska to determine whether most passengers (including Plaintiff) qualify for a

3  Tourism Tax Exemption at the time that the ticket is purchased.  (*Id.;* JARVIS DECL. ¶¶ 5-6;

4  Butler Decl. ¶ 3.)  In short, *there  simply was no feasible opportunity for Alaska to be able*

5  *to inspect the Plaintiff's FM-2 or FM-3 Visa prior to requiring Plaintiff to pay for his*

6  *ticket and the Mexican Tourism Tax.*

7          Even assuming, *arguendo,* that Plaintiff's injury did not occur while he was on

8  board Alaska flights (which in fact it did), the alleged damage to the Plaintiff would have

9  then occurred during the process of embarkation, either for his flight from San Francisco to

10  San Jose del Cabo, or when he returned from Mexico to the United States (assuming it was

11  onboard an Alaska Airlines flight), and therefore would still be covered under Articles

12  17(1) and 29 of the Montreal Convention.  The Alaska customer service agents that

13  process passengers checking in for flights from the United States to Mexico generally do

14  not make a determination whether or not the passenger is exempt from the Mexican

15  Tourism Tax.  (JARVIS DECL. ¶¶ 3-5.)  Given the more than 1.4 million passengers on

16  Alaska Airlines traveling between the United States and Mexico each year, it "would be

17  impractical and unduly burdensome and costly for [Alaska Airlines] to require [its]

18  customer service agents to ask each passenger to prove whether or not he or she is exempt

19  from the Mexican Tourism Tax during the check-in process for the United States to

20  Mexico leg of that passenger's journey."  (*Id.* ¶ 5.)

21          Alaska maintains that its customer service agents at the Mexican and United States

22  airports are not required to affirmatively ask a passenger if he or she is entitled to a refund

23  of the Tax.  However, even assuming, *arguendo,* that Alaska owed such a duty, it is clear

24  that its failure to make such inquiry during the check-in process (in either Mexico or the

25  United States) is covered under the Montreal Convention.  In *Mbaba v. Societe Air France*,

26  457 F.3d 496 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 959 (2007), the plaintiff purchased a

27  ticket on Air France from Houston, Texas to Lagos, Nigeria, with a layover in Paris,

28  France.  When the plaintiff checked in for the flight in Houston, he paid a $520 excess

1    baggage fee – $130 for each of his four extra bags.  In Paris, Air France unloaded the

2    plaintiff's baggage and he missed is connecting flight to Lagos.  He reclaimed the baggage

3    and spent a night in the airport terminal.  The next day, when plaintiff checked in for the

4    new Lagos flight, an agent told him he would have to pay $4,048.66 for the extra bags

5    (based on the weight of the bags).  Plaintiff paid the fee with his credit card, and then sued

6    Air France in state court in Texas, alleging breach of contract, violation of the Texas

7    Deceptive Trade Practices Act, and common law fraud.  Air France removed the case to

8    federal court, and the court ultimately entered summary judgment to Air France, holding

9    that the Warsaw Convention preempted plaintiff's state law claims.

10         The Fifth Circuit affirmed on appeal. The plaintiff argued that his claims could not

11    be preempted because his injuries were not contemplated by the Convention.  The plaintiff

12    focused on the fact that his injury as not even within the broad categories of the

13    Convention: personal injury [Article 17], lost or damaged baggage [Article 18] or delay

14    [Article 19].  The plaintiff asserted that if the district court's judgment was affirmed, that

15    meant that unless an injury is specified in the Warsaw Convention, there can be no remedy

16    for it.  (*Id*. at 499.)  Plaintiff further contended that "'An airline could, if it chose, even line

17    up passengers on an international flight and *rob them at gunpoint* without fear of any civil

18    liability to the victims whatsoever.' Robbery is not prohibited by the Convention.'"  (*Id*.)

19    (Emphasis in original).)  In rejecting this argument, the Fifth Circuit stated that plaintiff's

20    "argument fails to overcome the text of the Convention and *Tseng*."  (*Id*. at 500.)

21         Similarly here, just as the Warsaw Convention applied to the plaintiff's state law

22    claims in *Mbaba* arising of Air France's charging him additional baggage fees when he

23    checked in for his international flight, the Montreal Convention applies to any claim by

24    Nelson that he was not refunded the Mexican Tourism Tax when he checked in for his

25    flights from the United States to Mexico.

26    ///

27    ///

28    ///

1    **C.    The Airline Deregulation Act ALSO Preempts and Prohibits the**

2    **Plaintiff's State Law Claims**

3    In addition to being preempted and barred by the MONTREAL CONVENTION,

4    Plaintiff's claims are also preempted and barred by the Airline Deregulation Act ("ADA"),

5    currently codified at 49 U.S.C. § 41713(b).  Congress enacted the ADA in 1978 to

6    deregulate the airline industry.  (*See* 49 U.S.C. § 40101(a)(6), (a)(12)(A) (formerly

7    codified at 49 U.S.C. § 1302(a)(4), (a)(9)); *Charas v. Trans World Airlines, Inc.,* 160 F.3d

8    1259, 1265 (9th Cir. 1998).)  In enacting the ADA, Congress determined that "maximum

9    reliance on competitive market forces would best further efficiency, innovation, and low

10   prices as well as variety [and] quality . . . of air transportation services."  (*Morales v. Trans*

11   *World Airlines, Inc.,* 504 U.S. 374, 378, (1992) (citation and internal quotation marks

12   omitted).)  Congress included an express preemption provision in the ADA "[t]o ensure

13   that the States would not undo federal deregulation with regulation of their own."  (*Id.*; *see*

14   *also Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 194 (3rd Cir. 1998)

15   (Congress enacted the ADA to "prevent the states from re-regulating airline operations so

16   that competitive market forces could function"); *Charas,* 160 F.3d, at 1265 ("The purpose

17   of preemption is to avoid state interference with federal deregulation").)

18   The ADA provides, in relevant part that "[e]xcept as provided in this subsection, a

19   State, political subdivision of a State, or political authority of at least 2 States ***may not***

20   ***enact or enforce a law,*** regulation, or other provision ***having the force and effect of law***

21   ***related to a price, route, or service of an air carrier….***" (49 U.S.C. § 41713(b)(1)

22   (Emphasis added).)

23   The phrase "related to a price, route, or service of an air carrier" is to be broadly

24   construed.  In *Morales,* the Supreme Court examined whether the ADA preempted

25   enforcement of state guidelines concerning regulation of air fare advertising.  The Court

26

27

28

1  focused on the preemption clause's "relating to"[9] language.  (*Morales*, 540 U.S. at 383-

2  86.)  Relying on its ERISA line of cases and the ordinary meaning of the statutory

3  language, the Court construed the phrase "relating to" broadly to preempt "State

4  enforcement actions having a connection with, or reference to, airline 'rates, routes, or

5  services.'"  (*Id.* at 384.)  The Court held:

> For purposes of the present case, the key phrase, obviously, is "relating to".
> The ordinary meaning of these words is a broad one – "to stand in some
> relation; to have bearing or concern; to pertain; refer; to bring into
> association with or connection with," Black's Law Dictionary 1158 (5[th] ed.
> 1979) – and the words thus express a broad pre-emptive purpose.  We have
> repeatedly recognized that in addressing the similarly worded pre-emption
> provision of [ERISA], 29 U.S.C. § 1144(a), which pre-empts all state laws
> "insofar as they . . . relate to any employee benefit plan."  We have said, for
> example, that the "breadth of [that provision's] preemptive reach is apparent
> from [its] language," . . . that it has a "broad scope," . . . and an "expansive
> sweep," . . . and that it is "broadly worded," . . . "deliberately expansive," . . .
> and "conspicuous for its breadth." . . . Since the relevant language of the
> ADA is identical, we think it appropriate to adopt the same standard here:
> **State enforcement actions having a connection with or reference to
> airline "rates, routes, or services" are pre-empted** under [the ADA].

14  (*Id.* at 383-84) (Emphasis added.)

15  Based on this "broad preemptive purpose," the Court rejected contentions that the

16  ADA only preempted states from actually prescribing rates, routes, or services, and that

17  only state laws specifically aimed at the airline industry were preempted.  (*Id.* at 384-86.)

18  The Court held that the state law guidelines had the "forbidden significant effect" on the

19  airlines' rates, routes and services, primarily because they restricted fare advertising, which

20  "relates to" price.  (*Id.* at 388-89; *see also Rowe v. N.H. Motor Transp. Ass'n*, 522 U.S. __,

21  128 S. Ct. 989, 998 (2008) (Ginsburg, J., concurring) (noting the "breadth of [the]

22  preemption language" in the Federal Aviation Administration Authorization Act of 1994,

23  whose preemption provision (49 U.S.C. § 14501(c)(1)) is in pari material with that of the

24  ADA); *Hingson v. Pacific Southwest Airlines*, 743 F.2d 1408, 1415 (9th Cir. 1984)

25

---

26  [9]  The prior version of what is now 49 U.S.C. § 41713(b)(1) – 49 U.S.C. § 1305(a)(1) –
     preempted States from enacting or enforcing laws "*relating to* rates, routes, or services
27   of any air carrier . . . ." (Emphasis added.)  Congress intended the revision to make no
     substantive change.  (*See American Airlines, Inc. v. Wolens*, 513 U.S. 219, 221 n.1, 115
28   S.Ct. 817 (1995) (citing Pub. L. 103-272, § 1(a), 108 Stat. 745).)

1  ("'[ADA] preemption is not limited to those state laws or regulations that **conflict** with

2  federal law.  It preempts state laws and regulations '**relating** to rates, routes, or services.'"")

3  (Emphasis in original).)

4          Plaintiff's claims for breach of contract and "money had and received" challenging

5  Alaska's conduct in allegedly collecting but failing to remit the Mexican Tourism Tax are

6  clearly preempted by the ADA because they have an undeniable "connection with" the

7  "price, route or service of an air carrier . . . ."  (49 U.S.C. § 41713(b)(1).)  Earlier this year,

8  U.S. District Court for the Central District of California held that claims which were nearly

9  identical to those asserted by the Plaintiff here were preempted by the ADA.  (*Sanchez v.*

10  *Compania Mexicana de Aviacion, supra* (ATKINS-PATTENSON DECL.")., Exh. B).)  In

11  *Sanchez*, the plaintiff (like Nelson here) alleged that she, and the class of persons she

12  sought to represent, were improperly charged "a certain Mexican tourism tax imposed by

13  the government of Mexico and collected by airlines on behalf of the government of

14  Mexico in connection with the sale of passenger tickets for flights to Mexico."  (*Id*. at 2.)

15  The plaintiff there (like Nelson here) claimed that "she was exempt under Mexican law

16  from payment of the Mexican tourism tax" and that Mexicana Airlines "breached [its]

17  contracts of carriage by collecting the tourism tax from her and other passengers who were

18  purportedly exempt."  (*Id*. at 4.)

19          In granting summary judgment for the airline based on ADA preemption, the court

20  emphasized that "all of the claims asserted" by the plaintiff "concerning the Mexican

21  tourism tax relate to Mexicana's prices, routes and services . . . ."  (*Id*. at 4-5.)  The court

22  held:

23          The claims . . . concerning the collection of the Mexican tourism tax relate
            to Mexicana's prices because the Mexican tourism tax is collected together
24          with the purchase price of the passenger ticket and is related to and
            intertwined with the sale, price, and issuance of the passenger tickets.
25

26  (*Id*. at 5.)

27  The Court added that such claims "also relate to Mexicana's routes and services because

28  the Mexican tourism tax is collected only on routes between Mexico and other countries

and it is part of the services provided by Mexicana to its customers to facilitate the flow of

passengers through Mexican airports by eliminating the need for passengers to stand in

line at Mexican airports to pay the tourism tax prior to entering the country." (*Id.*)  The

court further stated:

> Claims seeking reimbursement of government fees and taxes, including charges on behalf of foreign sovereigns such as the Mexican government, which are collected by Mexicana with the purchase price of a passenger ticket are preempted by the Airline Deregulation Act, because they are related to the prices charged by airlines.  Since the tourism tax which plaintiffs here seek to recover is collected by Mexicana as part of the price of the passenger ticket, the tourism tax is related to pricing, and all claims asserted by plaintiff . . . are preempted by the Airline Deregulation Act, as a matter of law.

(*Id.* at 6-7.)

The court also held:

> The preemptive coverage of the Airline Deregulation Act also applies to routes and services which are provided by the airline.  *See* 49 U.S.C. § 41713.  As the tourism tax is charged only on routes between Mexico and other countries and as the collection of the tourism tax at the time of ticketing is a service facilitating the flow of passengers through the airports in Mexico, . . . Sanchez's claims . . . are preempted by the Airline Deregulation Act on the grounds that the claims are related to Mexicana's routes and services.

(*Id.* at 7.)

As in *Sanchez,* Nelson is attempting to impose obligations on Alaska which "relate to" and

thereby affect Alaska's prices, routes and services.  Accordingly, the claims are preempted

by the ADA.  (*Id.* at 5-8.)

Several other cases also demonstrate why Plaintiff's claims here are preempted by

the ADA.  In *Buck v. American Airlines, Inc.,* 476 F.3d 29 (1st Cir. 2007), purchasers of

nonrefundable airline tickets that were never used sued American Airlines to recover

various fees and taxes that had been collected as part of the original ticket prices.  The fees

that allegedly were wrongfully withheld from the nonrefundable tickets included passenger

facility charges, customs fees, immigration fees, agricultural quarantine fees, security fees,

and charges on behalf of foreign governments.  In addition to claiming that the airline's

actions violated federal regulations, the plaintiffs asserted claims for breach of contract,

1  rescission, unjust enrichment, breach of the implied covenant of good faith and fair

2  dealing, breach of fiduciary duty, and civil conspiracy. (*Id.* at 32.)

3      The court held that the ADA preempted the plaintiffs' claims against the airline.

4  The court stated that the plaintiffs were "attempting to invoke state remedies to further a

5  state policy: that those who are wronged should have individualized access to the courts in

6  order to remediate that wrong. . . .  It is the imposition of this state policy that would

7  constitute forbidden state enforcement, in violation of the ADA's preemption provision,

8  because the ADA itself provides no private right of action." (*Id.* at 35.)

9      The plaintiffs in *Buck* argued that their suit did not affect prices (or rates), routes or

10 services of airlines because the lawsuit was filed after the prices (or rates), routes, and

11 services had been determined for the flights in question. (*Id.*)  In their view, airline ticket

12 prices (or rates) are composed of two separate components: (1) the *fare prices* (or rates)

13 set by the airlines, which comprise the base cost of a ticket, and (2) the *taxes, fees, and*

14 *charges* imposed by the government or other fee-levying authorities.  In rejecting this

15 argument, the First Circuit held:

16      This dichotomy blurs when contextualized within the contours of the
        "significant effect" doctrine.  Although the fees are in one sense separate
17      from the base fare, the two are inextricably intertwined.  In all events, an air
        traveler's concern is with the overall cost of his or her ticket.  Thus, when
18      an airline establishes the base fare, it must take cognizance of any
        surcharges that will be imposed by operation of law.  It is freshman-year
19      economics that higher prices mean lower demand, and that customers are
        sensitive to the full price that they must pay, not just the portion of the price
20      that will stay in the seller's coffers.  For that reason, an airline must account
        for the fees when setting its own rates.  It follows that a finding for the
21      plaintiffs in this case would impact base fares – and since past judgments
        affect future behavior, this is as true of the retroactive relief requested by
22      the plaintiffs as it is of the prospective relief that they request.

23      In view of these practical realities, it is not surprising that most of the
        courts to have considered suits for refunds of government fees associated
24      with air travel have found those suits preempted.

25 (*Id.* at 35-36.)

26      In *Statland v. American Airlines, Inc.,* 998 F.2d 539 (7th Cir. 1993), the court held

27 that a passenger's claim against American for allegedly withholding the 10% federal

28 excise tax on cancelled airline tickets was preempted by the ADA.  The court reasoned:

> [Plaintiff's] state law claims are for breach of fiduciary duty, violation of the Illinois Consumer Fraud and Deceptive Practices Act, conversion and breach of contract. The conduct she complains of is the same for each claim, however: ***she protests American's practice of withholding 10 percent of the federal tax on canceled tickets. We think it obvious that canceled ticket refunds relate to rates***. Under *Morales* and [the ADA], states cannot regulate American's ticket refund practices either by common law or by statute. This sweeps aside [plaintiff's] state law claims.

*Id*. at 541-42 (Emphasis added).)

Similarly here, whether or not Alaska refunds the Mexican Tourism Tax paid by a passenger exempt from such tax "relate[s] to rates" and is therefore preempted by the ADA.

In *Lehman v. USAir Group, Inc.* 930 F. Supp. 912 (S.D.N.Y. 1996), airline passengers alleged that airlines improperly subjected them to the federal 10% excise tax after the tax expired. The court held that the passengers' state-law claims for conversion and unjust enrichment were preempted. The court explained that "The conversion and unjust enrichment claims relate to the defendants' ticket prices within the meaning of" the ADA. (*Id*. at 915.) "Both claims expressly refer to the collection of the air transportation excise tax. The excise tax 'relates to price' because the ten per cent excise tax directly impacts the ticket price." (*Id*.) Similarly here, Alaska's purported collection of the Mexican Tourism Tax "relates to price" because the Mexican Tourism Tax "directly impacts the ticket price."

The fact that Plaintiff purports to allege a claim for breach of contract does not defeat Alaska's motion to dismiss his claims. In *Wolens v. American Airlines*, 513 U.S. at 228, the Supreme Court stated that ADA preemption does not "shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." The *Wolens* exception for contract claims cannot apply here. The only purported written promise that Alaska made, according to Plaintiff, is the language on Alaska's website setting forth Rule 40AS of the Alaska "International Contract of Carriage." That Rule states: "Any tax or other charge

1    imposed by government authority and collectable from a passenger will be in addition to

2    the published fares and charges." (*See* COMPLAINT ¶ 26.)

3        This language does not create any contractual obligation on the part of Alaska

4    toward its passengers.  Rather, it merely notifies the passenger that in addition to the

5    published fare and charge, the passenger can expect to have to pay government-imposed

6    taxes and charges.  This language also does not contain a promise that Alaska will refund

7    to the passenger any tax or fee for which the passenger ultimately turns out to be exempt.

8        The plaintiffs in *Buck* also argued that their claim for breach of contract was not

9    preempted because it fit within the *Wolens* exception for contract-based claims.  (*Buck*,

10    476 F.3d at 36.)  The court rejected this argument, stating that "the plaintiff's amended

11    complaint identifies only a single word – 'nonrefundable' – as common to their contracts

12    of carriage with a multitude of airlines.  It seems fanciful to suggest, in the circumstances

13    of this case, that the word 'nonrefundable' alone can anchor a breach of contract claim."

14    (*Id.*)

15        **D.    Plaintiff's Claims For Relief Otherwise Fails To State A Claim For**

16              **Which Relief Can Be Granted**

17        If for any reason the Court determines that either or both of the Plaintiff's claims for

18    relief are not preempted and prohibited by the Montreal Convention or the Airline

19    Deregulation Act, the Court should exercise supplemental jurisdiction under 28 U.S.C. §

20    1367[10] and dismiss the state law claims for failure to state a claim for which relief can be

21    granted.

22        **1.    The COMPLAINT Does Not State a Claim for Breach of Contract**

23        To establish a claim for breach of contract under California law, Plaintiff must

24    prove each of the following elements:  (1) that a contract existed; (2) that she performed,

_____

25    [10]    28 U.S.C.A. § 1367(a) provides: "Except as provided in subsections (b) and (c) or

26    as expressly provided otherwise by Federal statute, in any civil action of which the
      district courts have original jurisdiction, the district courts shall have supplemental

27    jurisdiction over all other claims that are so related to claims in the action within
      such original jurisdiction that they form part of the same case or controversy under

28    Article III of the United States Constitution. . . ."

1  or that her nonperformance was excused; (3) that all conditions precedent to Alaska's

2  performance occurred; (4) that Alaska breached the contract; and (5) that Plaintiff's

3  damages were proximately caused by Alaska's breach.  (*Acoustics, Inc. v. Trepte Constr.*

4  *Co.*, 14 Cal.App.3d 887 (1971).)  Absent from the COMPLAINT is any *factual* allegation

5  that there existed an actual *contract* between Alaska and Nelson that was breached.  As

6  discussed above, the only purported written promise which, according to Plaintiff, Alaska

7  made to her is the language on Alaska's website setting forth Rule 40AS of the Alaska

8  "International Contract of Carriage."  That Rule states: "Any tax or other charge imposed

9  by government authority and collectable from a passenger will be in addition to the

10 published fares and charges."  (*See* COMPLAINT ¶ 26.)  This language does not create any

11 contractual obligation on the part of Alaska toward its passengers.  Rather, it merely

12 notifies the passenger that in addition to the published fare and charge, the passenger can

13 expect to have to pay government-imposed taxes and charges.  This language also does not

14 contain a promise that Alaska will refund to the passenger any tax or fee for which the

15 passenger ultimately turns out to be exempt.

16     Because Alaska did not promise to refund the Mexican Tourism Tax if it ultimately

17 turned out that the Plaintiff was exempt, Alaska cannot be sued for breach of that never-

18 existing promise.

19          **2.    The COMPLAINT Fails to State a Claim for "Money Had and**

20                 **Received"**

21     Even assuming, *arguendo*, that Plaintiff's claim for "money had and received" was

22 not preempted by the Montreal Convention and/or the ADA (and it is), the COMPLAINT

23 fails to allege the necessary elements of the claim.  A claim for money had and received

24 arises in equity when "the defendant is indebted to the plaint for a ***certain sum*** for money

25 had and received by the defendant for the use of the plaintiff."  (*Schultz v. Harney*, 27 Cal.

26 App. 4th 1611, 1623 (1994) (Emphasis added)(citation and internal quotation marks

27 omitted).)  The three essential elements of the claim are:  (1) the defendant received

28 money, (2) the money received by the defendant was for the use of the plaintiff, and (3) the

1  defendant is indebted to the plaintiff.  (*Harney*, 27 Cal. App. 4th, at 1623)  The COMPLAINT

2  fails to allege the first element because there is no "certain sum" set forth in the

3  COMPLAINT which Alaska purportedly received from Plaintiff which, in equity, Alaska

4  should be required to repay.  Plaintiff's general allegation that he paid a $22 Tax on

5  various occasions during a four-year period does not identify a "certain sum" that

6  purportedly must be repaid.

7

8                                                **V.**

9                          **CONCLUSION AND REQUESTED RELIEF**

10          For all of the reasons set forth above, Alaska Airlines respectfully requests that this

11  Court dismiss the COMPLAINT and action with prejudice.

12  Dated:  July 29, 2008              Respectfully submitted,

13                                      SHEPPARD MULLIN RICHTER & HAMPTON LLP

14

15                              By        */s/ Philip F. Atkins-Patterson*

16                                        PHILIP F. ATKINS-PATTENSON
                                          Attorneys for Defendant
17                                        ALASKA AIRLINES,  INC.

18

19

20

21

22

23

24

25

26

27

28